[No. B228064. Second Dist., Div. Three. Feb. 24, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLEN TUGGLE, JR., Defendant and Appellant.

COUNSEL

John Raphling, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLEIN, P. J.**—Allen Tuggle, Jr., appeals the judgment (order granting probation) entered following his conviction by jury of burglary. (Pen. Code, § 459.)[1] Tuggle contends the presence of his fingerprint on a moveable object in the burglarized residence is insufficient to support the conviction absent a showing the fingerprint could not have been placed on the object at some earlier time. He also contends the trial court abused its discretion in allowing a forensic identification deputy to testify regarding the durability of fingerprints and the order directing Tuggle to pay attorney fees must be vacated for failure to comply with section 987.8, subdivision (b).

We accept the People's concession the case must be remanded to permit the trial court to comply with the reimbursement statute. On the remaining issues, we find no error. The burglarized residence, a model home in Lancaster, was cleaned before it opened in 2006 and thereafter was cleaned on a monthly basis until April of 2008. After the burglary in November of 2008, Tuggle's fingerprints were found on a vase that was on the ground next to a fireplace. When Tuggle was arrested in February of 2009, he admitted he had not been in any model homes in Lancaster in the previous two years. Based on the regular cleaning of the home and Tuggle's postarrest statement, we conclude the evidence demonstrated Tuggle did not innocently leave his fingerprints on the vase. We further conclude no error appears in the admission of the testimony of a forensic identification deputy regarding the durability of fingerprints.

Thus, we reverse the order directing Tuggle to pay attorney fees, and remand the matter to the trial court for notice and a hearing as required by section 987.8, subdivision (b). In all other respects, we affirm the judgment.

## STATEMENT OF FACTS

1. *The burglarized residence.*

At trial, Sandra Rubio, a project manager for American Premier Homes (APH), testified that in 2005 APH developed a residential project in Lancaster which included the home at 1828 Kaylyn Street. When construction on the home concluded in 2006, APH contracted with JAG Interiors Inc. to furnish the home as one of three model homes. While the model homes were in use, they were cleaned once a month by a contractor, Magic Maintenance. The cleaning included "dusting and mopping everything." The model home was in use from 2006 until April of 2008. It was cleaned regularly during that

---

[1] Subsequent unspecified statutory references are to the Penal Code.

time and no additional furnishings were brought to the home. In April of 2008, the project closed, the model homes were locked and the regular cleaning ceased. After the home was closed to the public, APH did not allow anyone to enter the home other than the superintendent. Rubio does not know Tuggle, he is not an APH employee and he did not have permission to enter the home.

Jamie General, an interior designer with JAG Interiors, supervised the furnishing of the model home at 1828 Kaylyn Street. General recalled it was "superhot, windy, [and] dusty" when the furnishings were delivered. "[E]verything got dirty because we had to leave all the windows and doors [open] because they didn't have any air [conditioning] yet. . . . [W]e were installing for five days in about 115 degree weather." The furnishings were delivered by Delivery Associates. General did not recognize Tuggle and, to General's knowledge, Tuggle was not hired to help with the delivery. After the furnishings were installed, a cleaning crew prepared the house for a grand opening.

APH superintendent Tommy Kozenko testified that on November 8, 2008, he discovered someone had broken into the model home at 1828 Kaylyn Street and ransacked it during the previous week. Items taken in the burglary included a refrigerator and the stereo speaker system. Kozenko indicated the model homes were kept in "spotless" condition while they were open to the public. When Kozenko entered to investigate the burglary, the interior of the home was dusty. Kozenko found a glass candleholder vase and other items on the floor next to the fireplace and it appeared the vase had been moved. At the time of the burglary, the air conditioning system remained in operation to protect the home from damage due to dust. The project was surrounded by undeveloped land. Dust and high wind were "big problem[s]" in the area.

### 2. The fingerprint evidence.

On November 10, 2008, Ann Mercer, a community service officer, lifted numerous fingerprints from objects inside the residence at 1828 Kaylyn Place. When Mercer entered the residence, she noticed "dust rings," which indicated objects had been moved. Mercer lifted fingerprints from a candle vase and noted on the print card the vase had been next to the fireplace.

Sheriff's Deputy Jeffrey Collins, a forensic identification deputy, matched Tuggle's fingerprints to fingerprints Mercer lifted from the vase. Collins explained that fingerprints are made by amino acids, they are delicate and they have a tendency to evaporate. In order for a fingerprint to remain on an object for three years, the object could not be "washed, cleaned, dusted, or anything like that. Because when you do have something like that, that's

going to destroy your fingerprint. It's just going to wipe it out." "If an object is cleaned and it's cleaned monthly, even every two or three months, whatever fingerprint that is left prior to that is going to be contaminated or totally eliminated because you have that surface disturbed." "You can pretty much eliminate any fingerprint just by wiping it down once." Based on the testimony Collins heard, which indicated "these objects were being cleaned, it's highly unlikely a fingerprint would be sitting there for three, four years . . . ."

3. *Tuggle's statements.*

Sheriff's Deputy Daniel Mahoney arrested Tuggle on February 24, 2009. Tuggle told Mahoney he had not been in, around or near any model homes in the previous two years and he had been working with Labor Ready for two years. When Mahoney asked if Tuggle's fingerprints would be inside any model home in Lancaster, Tuggle said he was in no position to look at or buy a home and his fingerprints should not be in any model home in Lancaster.

## DISCUSSION

1. *The evidence supports the conviction of burglary.*

Tuggle contends no rational trier of fact could have found him guilty of burglary based solely on the presence of his fingerprint on a moveable object inside the burglarized home. Tuggle relies on *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, a case in which a murder conviction was predicated on the presence of the defendant's fingerprints on a turnstile post which was determined to be the likely murder weapon. The turnstile post had only been in the victim's possession for four months. Prior to that time, it had been in a store where it presumably had been accessible to the general public. *Mikes* recognized that fingerprint evidence alone may support a conviction under certain circumstances, but concluded that, "in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while committing the crime in question*, the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date. [Citations.] In order to meet this standard the prosecution must present evidence sufficient to permit the jury to conclude that the objects on which the fingerprints appear were inaccessible to the defendant prior to the time of the commission of the crime." (*Id.* at pp. 356–357, fn. omitted.)

*Mikes* concluded the defendant's fingerprints might have been placed on the turnstile post before the victim purchased it four months earlier. (*Mikes v. Borg, supra*, 947 F.2d at p. 359.) Because the record failed to establish the

turnstile post was inaccessible to the defendant prior to its acquisition by the victim, *Mikes* concluded the conviction violated the defendant's right to due process. (*Id.* at p. 361.)

■ Initially we note that *Mikes*, a decision of an intermediate federal court, is not binding authority on this court. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1292 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [36 Cal.Rptr.2d 474, 885 P.2d 887].) **(2)** Further, under California law, it is established that fingerprints are strong evidence of identity and ordinarily are sufficient, without more, to identify the perpetrator of a crime. (*People v. Johnson* (1988) 47 Cal.3d 576, 601 [253 Cal.Rptr. 710, 764 P.2d 1087]; *People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1588 [4 Cal.Rptr.2d 40] [palm prints found on a window which was the point of entry for a burglary were sufficient for a conviction where there was no evidence the defendant, who had visited the apartment before the burglary, had been present after the window was cleaned and there was no evidence the defendant would have had occasion to place his hand on the window "except to gain surreptitious entry into the apartment"]; *People v. Preciado* (1991) 233 Cal.App.3d 1244, 1247 [285 Cal.Rptr. 22] [fingerprints on a wristwatch box in a burglarized apartment were sufficient for a conviction because the victim did not know the defendant and the box, which the victim received as a gift 18 months earlier, had never left the home].)

In any event, even applying *Mikes* to the facts presented, the evidence of regular cleaning of the home, combined with Tuggle's postarrest statements, permitted the jury "reasonably [to] infer that the fingerprints were in fact impressed at [the time of the offense] and not at some earlier date." (*Mikes v. Borg, supra*, 947 F.2d at pp. 356–357.)

General, the interior designer who furnished the home, testified the windows were left open during the installation process due to oppressive heat. As a result, "everything got dirty" and the home was cleaned before it was opened to the public. Kozenko testified dust and high winds were constant problems in the area and, even when the home was closed and air conditioned, dust accumulated in the residence and the interior of the home was dusty when Kozenko entered to investigate the burglary. Kozenko further indicated that, while the model home was open to the public, it was maintained in "spotless" condition. Kozenko found the vase and several other items on the floor next to the fireplace. When Mercer processed the crime scene for fingerprints, she saw dust rings in the home that indicated items recently had been moved.

Also, Tuggle stated at the time of his arrest in February of 2009 that he had been employed by Labor Ready for the two years prior to his arrest and he

had not been in any model homes in Lancaster in the previous two years. These statements excluded the possibility Tuggle might have touched the vase either as an employee of Magic Maintenance or during a visit to the model home in the two years before his arrest.

Finally, Collins testified that in order for a fingerprint to remain on an object, the object could not "be moved," "washed, cleaned, dusted, or anything like that" because "that's going to destroy your fingerprint. It's just going to wipe it out."

From this evidence, the jury reasonably could infer any fingerprints that had been placed on the vase more than two years before Tuggle's arrest would have been obliterated.

Tuggle seeks to avoid this conclusion by arguing none of the witnesses testified the vase specifically had been cleaned. Thus, unlike *People v. Figueroa, supra,* 2 Cal.App.4th 1584, there was no evidence the specific area where the print was found had ever been cleaned.

However, General testified the house was cleaned before it was opened because *"everything* got dirty" (italics added) during the installation of the furnishings and Rubio testified the monthly cleaning involved "mopping and dusting *everything"* (italics added). Considering the dusty environment outside the home and the presence of dust and dust rings in the home, despite the continuous use of air conditioning after the home was closed to the public, it is apparent the thorough cleaning to which the house routinely was subjected would have included display items such as the vase in order to maintain the home in "spotless" condition. Thus, the evidence permitted the reasonable inference the vase specifically and repeatedly had been cleaned of dust.

█ Based on this evidence, the jury reasonably could conclude Tuggle left his fingerprints on the vase during the commission of the burglary and not at some prior time. Thus, even under *Mikes,* the evidence supports Tuggle's burglary conviction.

 2. *No abuse of discretion appears in the admission of Collins's testimony regarding the durability of fingerprints.*

 a. *Relevant background.*

Before offering the opinion at issue, Collins testified he had been assigned to the Sheriff's Scientific Services Bureau (crime lab) for seven years and prior to that he had been a deputy sheriff for 19 years. The primary focus of

the crime lab was "fingerprint identification and also crime scene investigation for major crime scenes . . . ." When Collins first started with the fingerprint unit, he examined and processed crime scenes for fingerprints with a training officer for a year and a half. After passing proficiency tests, he advanced to fingerprint examination and attended a field investigation course conducted by California State University, Long Beach. Collins had also attended "several fingerprint identification courses," which examined every aspect of finger and palm prints as well as the "background and the history of fingerprints." Collins "also trained at the Los Angeles Sheriff's Department on crime scene investigation and fingerprint identification." In addition, Collins belongs to several fingerprint organizations.

After Collins identified Tuggle's fingerprints on the print cards, the prosecutor asked Collins to assume the fingerprints had been lifted from an object that had been extremely dusty and, after it was placed in the home, a cleaning crew cleaned the home and, for a period of three years thereafter, the home was cleaned once a month. Given those facts, the prosecutor asked the probability of fingerprints being on that item after three years. Collins responded fingerprints are created by oils and amino acids on the hands. Consequently, "they are delicate" and could evaporate from a surface after as little as 10 minutes.

As Collins began to explain how fingerprint evidence could be contaminated, defense counsel objected. At the sidebar, defense counsel complained the prosecutor was attempting to elicit "an expert opinion from a non-expert," Collins was "not a criminalist," and no "foundation [had been] laid for this person to testify as a forensic expert because he's a deputy who has been trained in analyzing fingerprints." Defense counsel argued Collins was not making fingerprint comparisons but was "talking about science now. He's talking about oils."

The trial court overruled the objection, stating: "I am reading it more of contamination. And in my opinion at this point it's going more to weight as opposed to admissibility. I think he's laid the foundation that he's a fingerprint expert. [¶] I think you can attack him if you choose [based on] his lack of training in the scientific fields . . . , but I think he qualifies as a fingerprint expert."

Thereafter, on cross-examination, Collins admitted that, if a fingerprint is not contaminated and does not evaporate, it will remain on an object. "The print can be kept there as long as nobody clean[ed] it, nobody wipes it down, nobody touches that object . . . ."

### b. *Tuggle's argument.*

Tuggle contends expertise in the identification of fingerprints did not qualify Collins to testify about the durability of fingerprints. (See *People v. Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93], overruled on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].) Further, Collins's testimony was not consistent with the consensus of opinion that fingerprint evidence may last indefinitely. (*Mikes v. Borg, supra*, 947 F.2d at p. 358.)

Tuggle claims the admission of Collins's testimony "demolished" Tuggle's defense that his fingerprints were placed on the vase when the vase was in a store prior to being placed in the home or during a visit to the model home before February of 2007. Tuggle concludes that, absent Collins's testimony, it is reasonably likely the jury would have found him not guilty.

### c. *Relevant principles.*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert," and "may be shown by any otherwise admissible evidence, including his own testimony." (Evid. Code, § 720, subds. (a), (b).)

 "[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony." (*People v. Hogan, supra*, 31 Cal.3d at p. 852.) "Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].)

"The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse." (*People v. Bolin* (1998) 18 Cal.4th 297, 321–322 [75 Cal.Rptr.2d 412, 956 P.2d 374]; see *People v. Panah* (2005) 35 Cal.4th 395, 478 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1175 [64 Cal.Rptr.2d 892, 938 P.2d 950].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 162 [121 Cal.Rptr.2d 106, 47 P.3d 988].) " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes

more to the weight of the evidence than its admissibility." ' [Citation.]" (*People v. Bolin, supra*, at p. 322.)

 d. *Analysis.*

Here, Collins testified that, during the seven years he was assigned to the crime lab, he initially examined and processed crime scenes for fingerprints with a training officer for a year and a half. He then advanced to fingerprint examination and attended a field investigation course conducted by California State University, Long Beach. Collins also attended "several fingerprint identification courses" which examined every aspect of finger and palm prints as well as the "background and the history of fingerprints." Collins "also trained at the Los Angeles Sheriff's Department on crime scene investigation and fingerprint identification." In addition, Collins belongs to several fingerprint organizations.

Thus, Collins had special knowledge, training, and experience that qualified him to testify as an expert in the identification of fingerprints at crime scenes and the circumstance under which identifiable fingerprints may be lifted from an object. Based on this education and experience, testimony regarding the durability, contamination and destruction of fingerprints was not outside the realm of his expertise.

Tuggle objects that Collins was not a criminalist, was too busy to read peer review studies and did not have a "scientific education." However, as the trial court observed, complaints regarding the degree of an expert's knowledge go more to the weight of the evidence than to its admissibility. (*People v. Bolin, supra*, 18 Cal.4th at p. 322.)

Tuggle's reliance on *People v. Hogan, supra*, 31 Cal.3d 815, is misplaced. The defendant in *Hogan* claimed bloodstains on his clothing were the result of kneeling near the victims. (*Id.* at p. 821.) At trial, over the defendant's objection, a criminalist "opined that certain stains were 'splatters,' caused by blood flying through the air following impact rather than by mere contact with a bloody object." (*Id.* at p. 851.)

*Hogan* found the criminalist's "qualifications as an expert to determine whether blood had been spattered or transferred by contact were nonexistent." (*People v. Hogan, supra*, 31 Cal.3d at p. 852.) The criminalist had never performed laboratory analyses to determine the source of bloodstains and he had received no formal education or training on the subject. The criminalist had previously viewed an exhibit prepared by another criminalist that demonstrated blood spatter patterns, had read a book about the flight patterns of blood, "had observed bloodstains at many crime scenes, and had determined in his own mind whether they were spatters or 'wipes,' but had never

verified his conclusions in any way." (*Id.* at p. 852.) *Hogan* concluded "mere observation of preexisting stains without inquiry, analysis or experiment, does not invest the criminalist with expertise to determine whether the stains were deposited by 'spatters' or 'wipes.'" (*Id.* at p. 853.) Thus, the trial court abused its discretion in qualifying the criminalist as an expert on the subject of the source of bloodstains.

Unlike the criminalist in *Hogan* who lacked expertise in determining the manner in which bloodstains are deposited, Collins's training, experience and education rendered him an expert in the use of fingerprint evidence, including how fingerprints are impressed on an object, the circumstances under which a viable fingerprint may be lifted from an object and the numerous ways fingerprints may become contaminated and unusable. Consequently, the trial court did not abuse its discretion in permitting Collins to testify about the durability of fingerprints.

Regarding Tuggle's assertion that Collins's testimony was in conflict with the accepted view that fingerprints may remain on an object indefinitely, Collins admitted on cross-examination that a fingerprint will remain on an object if it does not evaporate and "as long as nobody clean[ed] it, nobody wipes it down, nobody touches that object . . . ."

We therefore conclude the trial court committed no abuse of discretion in permitting Collins to testify as an expert on the durability of fingerprints.

3. *The order for reimbursement of attorney fees must be reversed.*

At sentencing, pursuant to section 987.8, subdivision (b), the trial court ordered Tuggle to pay attorney fees in the amount $2,543.13.

Tuggle contends the attorney fees order was improper because he did not receive notice and a hearing as required by section 987.8, subdivision (b).[2]

The People concede the record does not indicate Tuggle received the statutorily required notice and hearing concerning his ability to pay the attorney fees. Accordingly, the order must be reversed and the matter remanded to the trial court so that it can "provide the notice and conduct the hearing required by the statute." (*People v. Flores* (2003) 30 Cal.4th 1059, 1061 [135 Cal.Rptr.2d 63, 69 P.3d 979].)

---

[2] As relevant here, section 987.8, subdivision (b), provides: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. . . ."

## DISPOSITION

The order directing Tuggle to pay $2,543.13 in attorney fees is reversed and the matter is remanded to the trial court for notice and a hearing under section 987.8, subdivision (b) concerning Tuggle's ability to pay attorney fees. In all other respects, the judgment (order granting probation) is affirmed.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 9, 2012, S201268.