Filed 1/8/14  In re Jessie O. CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JESSIE O., JR., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESSIE O., JR.,<br><br>    Defendant and Appellant. | F066905<br><br>(Super. Ct. No. JW127070-04)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Peter A. Warmerdam, Temporary Judge.[†]

Jyoti Malik, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]Before Gomes, Acting P.J., Detjen, J. and Peña, J.

[†]Pursuant to California Constitution, article VI, section 21.

On appeal following adjudication of a Welfare and Institutions Code section 602, subdivision (a) petition, Jessie O., Jr. contends there is insufficient evidence he attempted to enter a residence. Thus, he argues the court's jurisdictional findings must be reversed. We will affirm.

## PROCEDURAL BACKGROUND

In a petition filed January 29, 2013, the Kern County District Attorney alleged Jessie committed the following violations: count 1—willful and unlawful attempt to enter an inhabited dwelling (Pen. Code,[1] §§ 664, 460, subd. (a)) and count 2—violating a prior court order regarding juvenile probation (Welf. & Inst. Code, § 777, subd. (a)).

Following contested proceedings held March 5, 2013, the juvenile court found all counts as alleged in the petition to be true beyond a reasonable doubt.

At the disposition on March 19, 2013, the court ordered, inter alia, Jessie be committed to Camp Erwin Owen for a period not to exceed three years four months, less 33 days' credit for time served. This appeal followed.

## FACTUAL BACKGROUND

Vicente Sotelo and his family left their residence on Clinton Street in Delano about 5:00 a.m. on September 5, 2012. Sotelo returned to the house alone about noon. He noticed four window screens had been removed from the home's front windows. After ensuring no one had been inside the home, Sotelo replaced three of the four screens. The fourth was broken and bent; it could not be replaced. When Sotelo left his home earlier that morning, the window screens were all in place. He reported the incident to the Delano police. Sotelo did not know Jessie, had never seen him before, and had never given Jessie permission to enter his home or remove the window screens.

Officer Michael Kraft with the Delano police responded to a report of a possible burglary on Clinton Street at about 4:30 p.m. on September 5, 2012. He noted a missing

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

2.

window screen from a window at the northwest corner of the home. The broken screen was lying on the ground nearby. The officer found no signs of forced entry into the home.

An examination of the window with the missing screen revealed latent prints on the windowpane. Having lifted dozens of latent prints during his career, Kraft dusted the window and lifted two prints from the lower left-hand corner of the window. The latent print card was booked into evidence and forwarded to the Kern County Sheriff's Department for analysis.

Nicole Townsend has been a latent print examiner with the Kern County Sheriff's Department since June or July 2010. She has received approximately 200 classroom hours of training in fingerprint comparison, and has been trained on the three systems used for the Automated Fingerprint Identification System (AFIS). She possesses certification from the International Association of Identification. To maintain that certification, she must complete a required training component and recertify every five years. Townsend's job entails taking the latent fingerprints collected at crimes scenes, searching the AFIS system for usable comparisons, and comparing the exemplars identified by AFIS to determine identity.

Fingerprints are unique to each individual and are formed prior to birth. A fingerprint may have many different characteristics that are used in comparison, including bifurcations, ending ridges, islands, and dots.

The Kern County Sheriff's Department performs the latent print comparisons for the City of Delano Police Department. In this case, the exemplars were obtained by scanning suitable fingerprint images into AFIS, then searching its local database. That local database is limited to Kern County, and the fingerprints maintained in the system are those taken at the time of arrest in Kern County. Typically, a suspect's fingerprints are rolled using the electronic LiveScan System. Each finger and thumb is scanned or rolled separately, followed by the four fingers on each hand as a grouping, and then finally a palm print.

After scanning the usable latent print here—a partial right index finger—into the AFIS system, the system provided Townsend with a candidate list. There were five candidates generated by the system, and Jessie was listed as the first candidate on the list.

The standard method employed by law enforcement agencies, including Townsend's employer, is called ACE-V (analysis, comparison, evaluation, verification). Initially, in the analysis phase, the examiner studies the latent print or prints to learn all he or she can know without looking at or comparing the print to an exemplar print. Doing so prevents bias by the examiner. Townsend did so here, studying the latent prints provided before looking at the exemplar. Thereafter, an examiner looks for characteristics in at least two of three levels of detail. Level one characteristics would include ridge flow to determine the way ridges are coming into and out of a pattern area, and pattern types such as whorls, loops, and arches. Level two characteristics include minutiae points like bifurcations, ending ridges, islands, and dots. Level three involves poroscopy, wherein exact pore structures, lines, or edgeoscopy are observed. Level three details are uncommon in latent prints. Because level one similarities are insufficient on their own to declare a fingerprint match, those similarities must be accompanied by the detail or characteristics found in either level two or level three.

Here, the right index finger from the latent print card displayed a right-slope loop with a low ridge count, multiple different bifurcations, multiple ending ridges, and a dot up at the very top. When compared to the exemplar print generated by AFIS, Townsend identified similar characteristics and found the prints to be a match. The exemplar print belonged to Jessie. Level one and level two characteristics were used to make the match; no level three characteristics were noted. Townsend did not count the number of characteristics matched between the two prints and explained that, in the United States, there is no numerical standard that must be employed before a match can be declared. Each comparison is different, with some characteristics carrying more weight than others. She would not be comfortable however declaring a match where only one characteristic was common between the latent print and the exemplar.

4.

Although the other prints lifted from the crime scene could not be scanned into the AFIS system as Townsend deemed them unusable or insufficient, she did later compare those latent prints to the other prints from Jessie's fingerprint card. The latent prints obtained were a left middle finger and a partial left palm print. These prints also matched Jessie's prints when compared to the exemplar generated by AFIS.

Townsend's results were verified by a second examiner. Thereafter, a report was prepared and forwarded to the arresting or investigating agency.

On cross-examination, Townsend noted there was no way to date or age a latent fingerprint. She acknowledged prints may fade over time and could be affected by a number of environmental factors like heat and dirt. She does not believe pressure or the variations in technique by the person lifting the print or prints can affect the size, shape or characteristics of a fingerprint. Townsend did testify that a glass surface accepts prints better than a wood surface because glass does not soak up oils from the skin.

Officer Mario Nunez, a supervisor on patrol shift with the Delano Police Department, is familiar with, and explained, his agency's booking process, including the taking of a suspect's fingerprints using LiveScan. Nunez is familiar with Jessie as he has had more than five contacts with Jessie and was present when Jessie was booked on a previous occasion in 2011. When Jessie was taken into custody on this offense, he resided on Austin Street in Delano, or about four to five blocks from the Sotelo residence. Jessie's prior address was on Dover Place in Delano, approximately seven blocks from the Sotelo residence.

## DISCUSSION

### *The Applicable Legal Standards*

The crime of burglary is defined, in pertinent part as follows: "Every person who enters any house … with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) Burglary of an inhabited dwelling house is burglary in the first degree. (§ 460, subd. (a).) "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished …." (§ 664.)

5.

When an appeal challenges the sufficiency of the evidence to support a juvenile court judgment sustaining the allegations of a Welfare and Institutions Code section 602 petition, we must apply the same standard of review applicable to any claim by a criminal defendant challenging the sufficiency of the evidence to support a judgment of conviction on appeal.

> "Under this standard, the critical inquiry is 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] An appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] [¶] In reviewing the evidence adduced at trial, our perspective must favor the judgment. [Citations.] '… The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]'" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371-1372.)

> "'It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] "Issues of fact and credibility are questions for the trial court." [Citations.] It is not an appellate court's function, in short, to redetermine the facts.' [Citation.] Under the substantial evidence rule, we 'must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' [Citation.]" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

> "'"[T]he standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] '"Circumstantial evidence may be

6.

sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.""" [Citation.]' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 960-961.)

### *The Trial Court's Ruling*

After considering the arguments of counsel, the juvenile court found as follows:

"THE COURT: Okay. Well, I have to say the testimony regarding the fingerprint evidence was certainly interesting. And a bit different than from what I'm used to having heard, but it's been awhile since I have heard a fingerprint case.

"And I have to say, generally, there is more information regarding points of comparison, and, certainly, it would have been perhaps good to know from Ms. Townsend exactly how many points she found that did in fact match.

"And while there were certain questions regarding if she knew how many matched, there was no—certainly no request to have her re-compare those to see what those totals would be.

"So what I do know is that it was sufficient, in her opinion, to convince her that those prints did, in fact, match.

"Listening to the testimony of Mr. Sotelo, it was clear that at 5:00 a.m. he left the house. That the screens were on his home when he left. And that when he came back, he noticed that they were off. And that he replaced three of the screens. The one that was bent, he did not replace. And that is probably why, logically, that Officer Kraft went to that window to look since that was the screen remaining on the ground.

"Whether or not there might have been other prints on the other windows, we certainly don't know.

"Whether they would have indicated that this young man had been at those windows, we don't know. Had it meant that others had been at those windows, we don't know. But certainly what it does show us is that this young man was at that window. And interestingly enough, while we have been bringing this case to its conclusion, I have stumbled across the case of *People versus Valencia, 28 Cal.Fourth, Number Page 1, 2002*, case which held that an entry sufficient for burglary occurred when there was a removal of an exterior window screen and a penetration into the area enclosed by the window screen, even though the window immediately covered by the screen was locked and not open. A window screen is part of the outer boundary of the building for purposes of a burglary.

7.

"So based on the evidence presented, the Court finds that Count 1 and 2 of the Petition to be true beyond a reasonable doubt."

*Our Analysis*

Jessie argues the juvenile court's findings are not supported by substantial evidence because fingerprint evidence is unreliable generally, and because examiner Townsend's testimony was vague and so lacking in detail as to "render her opinion insubstantial." Jessie also contends the victim unwittingly tampered with the evidence, the investigating officer did not bother to look for other prints, and the prosecution did not rule out the possibility there was an innocent explanation for Jessie's prints on the windowpane.

Initially, we note Jessie essentially asks us to find and declare that fingerprint evidence is fallible and unreliable. We decline his invitation. In California, it is established that fingerprints are strong evidence of identity and ordinarily are sufficient, without more, to identify the perpetrator of a crime. (*People v. Johnson* (1988) 47 Cal.3d 576, 601; see also *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1076; *People v. Bailes* (1982) 129 Cal.App.3d 265, 282 [defendant's thumbprint on bathroom window screen identified as point of entry into burglarized home sufficient for jury reasonably to infer defendant committed the burglary].) Palm print evidence is likewise sufficient alone to identify a defendant. (*People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1588.) The California Supreme Court continues to recognize the validity of fingerprint evidence. (E.g., *People v. Farnam* (2002) 28 Cal.4th 107, 160 ["the prosecution relied on a long-established technique—fingerprint comparison performed by fingerprint experts"]; *People v. Webb* (1993) 6 Cal.4th 494, 524.)

Jessie's challenges to the sufficiency of examiner Townsend's testimony are not persuasive. Jessie contends Townsend was unable to explain how she declared a match between the latent print and exemplar print. However, a review of Townsend's testimony reveals otherwise. While it is true Townsend did not count or otherwise total the number of characteristics she matched between the latent print obtained at the Sotelo residence

8.

and the exemplar prints belonging to Jessie that were generated by AFIS, she testified as follows:

> "[DEFENSE COUNSEL:]  And so in this case, did you look at the latent print prior to looking at the exemplar print?
>
> "A.  Yes.
>
> "Q.  And what characteristics of note did you find on that latent print? [¶] … [¶]
>
> "A.  It is a right-slope loop and it has a low, uhm, ridge count.  And then, I mean, there's different bifurcations.  There's a dot up at the very top.  There is multiple bifurcations, multiple ending ridges.  Uhm, it's mostly the center of the print all the way up to the top.
>
> "Q.  And then when you were done analyzing the latent, you looked at the exemplar?
>
> "A.  Yes.
>
> "Q.  And did you find all of those characteristics from the latent print in the exemplar print?
>
> "A.  Yes—uhm, I don't look at every single characteristic available, but I find enough characteristics to satisfy me that it is a match.
>
> "Q.  And how many characteristics were similar in this case?
>
> "A.  I didn't count."

After a lunch break, when cross-examination resumed, Townsend was asked, "And did you, then, find those same characteristics in the exemplar?"  She answered "yes."  She went on to testify that, within the ACE-V system, the points of similarity she identified between the latent print and the exemplar print fell into the level one and level two categories.  Townsend further testified there were no unexplainable[2] differences between the two prints.

---

[2]An explainable difference might include "pressure when the latent print was put down.  So if there's more pressure or less pressure, compared to when the print was rolled …."

While we are inclined to agree with the juvenile court that a number or count regarding the similarities identified between the two prints would have been helpful, no national standard exists regarding a minimum required number of similarities before a match can be declared.  Townsend did testify that *all* of the characteristics she identified in the latent print during her analysis were present when she compared the latent print to the exemplar print.  Those characteristics included level one characteristics of a right slope loop and low ridge counts, as well as level two characteristics of a dot and "multiple bifurcations" and "multiple ending ridges."  Townsend also testified there were no unexplainable dissimilarities.  A single dissimilarity would have meant no match.  Further, while Townsend did not count the number of similarities here, she did indicate a single similarity would not be enough to declare a match and explained each case is different.  We find Townsend's opinion as evidence is reasonable, credible and of solid value.

Additionally, while two other latent prints taken from the Sotelo residence were insufficient for purposes of an AFIS scan, those additional prints were compared to Jessie's prints.  More specifically, prints of a left middle finger and a partial left palm were compared to the exemplar generated by AFIS of Jessie's prints; both of these additional prints matched as well.

We note a recent opinion of the First Appellate District, Division Four, wherein a juvenile challenged the sufficiency of a palm print left on a window to support a burglary allegation.  In that case, the victim left her home at 7:30 a.m., ensuring the doors and windows were locked.  She returned home at 3:30 p.m. to find her home had been burglarized.  An investigating officer determined a bedroom window was the likely point of entry and several prints were lifted from the window, including a palm print on the outside of the glass.  (*In re O.D.* (2013) 221 Cal.App.4th 1001, 1003.)  A fingerprint examiner with the Contra Costa Sheriff's Department submitted the latent print to a computerized search on the state's database.  She then compared the latent print to O.D.'s prints, those prints having been generated as a possible match.  She concluded the prints

matched.  (*Id.* at pp. 1003-1004.)  The examiner employed the ACE-V fingerprint examination method.  She identified 11 points of similarity and explained her laboratory required at least eight points of similarity and no unexplainable discrepancies.  (*Id*. at pp. 1004-1005.)

On appeal, the defendant argued that because fingerprint evidence was not infallible, it could not be said the palm print recovered from the window definitively belonged to him.  (*In re O.D.*, *supra*, 221 Cal.App.4th at p. 1010.)  The appellate court found as follows:

> "[P]roof beyond a reasonable doubt does not require proof beyond any possible doubt, '" because everything relating to human affairs is open to some possible or imaginary doubt."'  [Citation.]  [The examiner] testified that she followed established procedures in making the palm print comparison.  Her conclusion that the palm print on [the victim]'s window was O.D.'s was substantial evidence that O.D. was the burglar.  [Citations.]"  (*Ibid*.)

Here, Townsend testified she followed the ACE-V method, the established procedure for making fingerprint identifications.  Further, she identified the specific characteristics on the latent print and testified each of those similarities was present in the exemplar identified as belonging to Jessie.  Townsend also testified there were no unexplained discrepancies between the two prints.  While it is true, unlike the examiner in *In re O.D*., Townsend did not count or record the number of those similarities, we do not find this omission fatal here.  There is no national standard regarding the number of similarities required, and the record does not establish any minimum required by the agency employing Townsend.  Moreover, the juvenile court found Townsend's testimony credible overall, and, hence, we defer to those findings.  (*In re S.A.*, *supra*, 182 Cal.App.4th at p. 1140.)

In conclusion, viewing the evidence in the light most favorable to the prosecution, the presence of Jessie's fingerprint on the windowpane, along with a lack of any valid nexus for his presence at the victim's home and Sotelo's unfamiliarity with him, provide sufficient evidence to support the finding of the trier of fact.  Therefore, a rational trier of

fact could have found the evidence was sufficient to sustain a true finding of attempted burglary.  (*In re Ryan N.*, *supra*, 92 Cal.App.4th at pp. 1371-1372.)  Because there is sufficient evidence to support the juvenile court's true finding as to the crime of attempted burglary, we decline to address Jessie's contentions that the victim tampered with evidence, that the investigating officer should have looked for other prints, and that the prosecution failed to rule out the possibility of an innocent explanation.

## DISPOSITION

The judgment is affirmed.