Filed 10/23/15  P. v. Ortiz CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY ORTIZ,<br><br>      Defendant and Appellant. | A142579<br><br>(Contra Costa County<br>Super. Ct. No. 51404433) |

Following an incident of domestic violence against his wife, Jeffrey Ortiz was charged with felony counts of inflicting corporal injury on a spouse and assault by means of force likely to cause great bodily injury.  (Pen. Code, § 273.5, subd. (a), 245, subd. (a)(4).)  He was placed on probation conditioned on six months in jail after a jury convicted him of the lesser included misdemeanor offenses of battery against a spouse, simple battery and simple assault.  (Pen. Code, §§ 242, 243, subd. (e)(1), 240.)  Appellant argues the judgment must be reversed because the trial court erred in allowing a former police officer and detective to testify as an expert in domestic violence and intimate partner battering for the limited purpose of explaining why a victim of domestic violence might recant or refuse to cooperate with law enforcement after initially reporting a crime.[1]  We modify the judgment to reverse the simple battery and simple assault counts as lesser included offenses of misdemeanor spousal battery, but otherwise affirm.

_____

[1]  "Although often referred to as 'battered women's syndrome,' 'intimate partner battering and its effects' is the more accurate and now preferred term.  (See, e.g.,

1

## I. BACKGROUND

The following evidence was presented to the jury:

### A. *Prosecution Evidence*

Appellant and his wife Liliana Acosta lived with their three children on California Street in San Pablo. On January 28, 2014, at about 5:48 p.m., Acosta went next door to the house where appellant's grandfather lived, called 911, and reported that appellant had just hit her.

Officer Justin Gatlin of the San Pablo Police Department responded to the call and found appellant and Acosta inside the family home with their children. Acosta did not smell of alcohol and did not appear to be under the influence or intoxicated. Gatlin took an initial recorded statement from her, during which she cried at times and appeared emotional. She had red marks in her eyes and a small laceration on her neck.[2]

Acosta told Gatlin that she and appellant began arguing after she came home and asked him whether he had fed the kids. Appellant unplugged the television set Acosta was watching and when she tried to plug it back in, he began kicking her on the floor. "[H]e grabbed me by the neck right here, and kicked me, and threw me on the floor and my kids thought he was crying . . . ." Their six-year-old daughter had come into the room crying and asking what was going on, and appellant told her, "If you wanna go with your mom, go with your fuckin' mom." Acosta told Gatlin she wanted appellant to go to jail that night.

---

Stats. 2004, ch. 609, §§ 1, 2 [changing references in Evid. Code, § 1107 . . . from 'battered women's syndrome' to 'intimate partner battering and its effects'] . . . .)" (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1 (*Walker*).) We use the preferred term in this opinion, although "battered women's syndrome" was used in the trial court.

[2] According to Hung-Wen Sun, a physician's assistant with experience in strangulation, photographs of Acosta taken after the incident showed red dots in her eyes that appeared to be petechiae consistent with strangulation. Dr. Kadeer Halimi, an emergency room physician called by the defense, testified that the redness in the photographs did not provide any evidence of strangulation and could have been caused by crying and rubbing the eyes.

2

Gatlin then spoke to appellant, who did not seem angry or hostile. Appellant said he and Acosta had gotten into an argument that escalated to a physical confrontation in which he had pushed her. He denied choking or hitting Acosta and did not express any fear of her. He did not indicate that Acosta had hit him.

After obtaining this initial statement from appellant, Gatlin returned to speak with Acosta a second time. Acosta told him appellant had grabbed her neck with his right hand, lifted her so her feet were in the air, and thrown her to the ground. She said the red marks in her eyes had been caused by appellant "grabbing her with his big old hands."[3]

Appellant was taken into custody and was interviewed at the booking facility after waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. In a recorded statement, appellant told Gatlin that Acosta had come home and started an argument. He pushed her after she threw "some candle thing" at him and she fell onto the couch. She got up and scratched him, and he pushed her again. Appellant said she had been yelling and calling the kids names and throwing things around. He denied slapping Acosta, grabbing her by the neck, or choking her in any way. He denied using alcohol or narcotics that day, but thought Acosta might have done so because she "goes to my Grandfather's house and drinks there all the time. And she's been there all day." Appellant had a scratch on his face.

As appellant acknowledged during his recorded statement, Acosta had previously called the police and reported domestic violence. On August 11, 2012, Officer Enrik Melgoza had responded to a call at the California Street address, and Acosta had met him outside, crying and emotional. Acosta told Melgoza appellant had thrown her to the ground, choked her and ripped her shirt. Her hair was disheveled, her shirt was ripped and she had a couple of red marks on the front of her chest and close to her neck. Appellant was inside the house with his friends Luis Gonzales and Julia Caudill, who told Melgoza they had been in a different room of the house and had not seen the altercation between appellant and Acosta. Appellant did not have any injuries. Photographs taken

_____

[3] Acosta is 5 feet 2 inches tall and weighs about 118 pounds. Appellant is 6 feet 1 inch tall and weighs about 265 pounds.

of Acosta a few days later showed bruising and discoloration on the left side of her neck, left arm and shoulder.

At the preliminary hearing in the case, Acosta testified that on the day of the charged offenses, she had returned home drunk.[4]  She had started drinking vodka at about 10:00 in the morning with her friend Angelina Luna and had eight to ten shots at Luna's house.  Acosta and appellant began to argue about feeding the children, and the argument became physical after she pushed appellant. She went next door to appellant's grandfather's house to tell him what had happened and to call 911.  Acosta claimed not to remember a lot of details because she was very intoxicated that evening.  She still loved appellant and did not want anything bad to happen to him.  She had called 911 because appellant kicked her out of their house during their argument.

The six-year-old daughter of appellant and Acosta was also called as a witness at the preliminary hearing.[5]  She testified that she saw her father hitting her mother as her mother tried to plug in the television set.  Her father slapped her mother on her face a couple of times, and her mother looked sad.  Her mother had been home when the children returned from school that day.

Inspector Rickey Rivera of the Contra Costa County District Attorney's Office was called by the prosecution as an expert on intimate partner battering and its effects, which occurs when a person "is battered repeatedly by someone who is in an intimate relationship with that person and/or close with that person, another family member, there's physical conditions, there's psychological conditions that they go through that keeps them in that cycle of domestic violence over and over again.  And they don't feel powerful enough to leave or they are fearful to leave the relationship or the abuse."

---

[4]  Acosta and her six-year-old daughter did not testify at appellant's trial, but portions of their preliminary hearing testimony was read to the jury following a hearing at which the prosecution established it had exercised due diligence to secure their presence. (See Evid. Code, §§ 240, subd. (a)(5), 1291, subd. (a).)

[5]  *Ibid.*

4

According to Rivera, both men and women could suffer from intimate partner battering and its effects, and alcohol or substance abuse could aggravate the situation.

Rivera testified that in his experience, as many as 95 percent of victims who report domestic violence to the police become uncooperative as witnesses. Victims who make a 911 call are receptive toward law enforcement at the time because they do not want to be hurt, but they typically change their stories or recant completely soon after. Rivera noted a number of reasons explaining this behavior: love for the abuser and hope he or she can change; feelings of responsibility for the abuse; a desire to keep the family together; concerns about finances; and pressure from the abuser's family. Rivera testified that in abusive relationships, the cycle of violence has three phases: the tension-building phase, where the stresses of everyday life cause tension to build in the abuser; the battery phase, in which the physical abuse occurs; and the honeymoon phase, in which the abuser expresses remorse and the victim, convinced the abuser will change, decides to stay in the relationship. When it becomes clear to the abuser that there won't be a criminal prosecution and the victim is not going to leave, the tension phase will begin to build again.

B. *Defense Evidence*

Appellant's grandfather, Ralph Ortiz, testified that on the day of the charged incident, Acosta had come to his house and started drinking alcohol at about 10:00 a.m. She left and returned crying 20 minutes later, said she and appellant had argued, and called the police. Ralph Ortiz had never seen appellant physically abuse Acosta, but he had seen Acosta abuse appellant. About a week before the charged incident, Acosta was drinking and had hit and kicked appellant. Six months earlier, she had assaulted Ralph Ortiz, but he had not called the police because she was family. On the night of the charged incident, Ralph Ortiz told the police that Acosta had said appellant hit her. He did not tell the police that Acosta had been drinking that day.

Appellant testified that on the day of the charged incident, he was playing with the children when Acosta came home acting like she had been drinking. She fell asleep on

5

the couch for a few minutes then awakened and started cursing and saying hurtful things to appellant. Acosta, who gets violent when she drinks, started cursing at the children about their room being messy and appellant helped them pick up their things. When Acosta turned on the television, appellant unplugged it and asked her to leave. Acosta pushed him and got close to his face, and he pushed her back because he was fearful of being attacked. Acosta fell on the couch but got back up and pushed appellant even harder. Appellant pushed Acosta again in her face. Acosta then walked out of the house and yelled, "Fuck you, bitch. You're going to jail." Appellant denied hitting or choking Acosta.

Appellant testified about the August 2012 incident in which Acosta called 911 and claimed he had assaulted her. He explained that he and Acosta had been visiting with his friends Espinoza and Caudill, talking and drinking in the kitchen. Acosta stormed out of the room after Espinoza and Caudill kissed, and a short time later there was a loud noise. Appellant went into the other room and saw that a table had been tipped over. Acosta was angry and asked appellant why he didn't treat her the way Espinoza treated Caudill. Appellant tried unsuccessfully to hug Acosta and calm her down, but she left and returned with the police.

Regarding Acosta's character for violence, appellant testified that during a gathering one Halloween she argued with and knocked down appellant's grandmother, who had cancer and was undergoing chemotherapy. Joseph Sandino, a friend and coworker of appellant's, witnessed this incident and testified that appellant was honest and peaceful, whereas Acosta was violent. Espinoza and Caudill testified about the August 2012 incident during which the police were called and described the evening in a manner consistent with appellant's version of events. They believed appellant to be an honest and peaceful person and Espinoza believed Acosta to be a violent person.

In February 2014, appellant made a video of an incident at the house at California Street in which Acosta appeared to have been drinking and told appellant to "[g]et the fuck out, just fucking leave." Appellant told Acosta to stop touching him and to get away from him. Appellant had been subject to a criminal restraining order at the time.

6

Acosta had been previously convicted of misdemeanor embezzlement.

## II.  DISCUSSION

### A.  *Expert Testimony on Intimate Partner Battering and Its Effects*

Appellant contends the trial court abused its discretion in allowing Inspector Rivera to testify as an expert on intimate partner battering and its effects because he lacked the necessary qualifications.  We disagree.

### 1.  General Principles and Standard of Review

Evidence Code section 1107 provides in relevant part:  "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behaviors of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.  [¶] (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness.  Expert opinion testimony on intimate partner battering and its effects shall not be considered a new scientific technique whose reliability is unproven."  Evidence Code section 801, subdivision (a) more generally permits an expert witness to offer an opinion that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and supplies an alternative ground for admitting expert testimony relating to domestic violence.  (See *People v. Brown* (2004) 33 Cal.4th 892, 907 (*Brown*).)

Expert testimony about the effects of intimate partner battering "speaks directly to both recantation and reunion by a domestic abuse victim."  (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 594 (*Gadlin*); see *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1215-1217 (*Morgan*).)  "[W]hen the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor."  (*Brown*,

7

*supra*, 33 Cal.4th at p. 906.)  Expert testimony to explain the phenomenon of recantation and minimization may be admissible even when the evidence shows only a single incident of domestic violence.  (*Id*. at pp. 906-908; *People v. Williams* (2000) 78 Cal.App.4th 1118, 1129.)

A witness is qualified to testify as an expert if he or she "has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates."  (Evid. Code, § 720, subd. (a).) Expertise is " 'relative to the subject,' and is not subject to rigid classification according to formal education or certification."  (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408 [police officer qualified to give expert testimony regarding horizontal gaze nystagmus test as an indicator of the influence of alcohol[6]].)

A trial court is given "considerable latitude" in determining an expert's qualifications and its ruling will not be disturbed on appeal unless the record demonstrates a manifest abuse of discretion.  (*People v. Bloyd* (1987) 43 Cal.3d 333, 357; see *People v. Dowl* (2013) 57 Cal.4th 1079, 1089.)  "Such an abuse of discretion will be found only where ' "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." ' "  (*People v. Chavez* (1985) 39 Cal.3d 823, 828.)  "[C]omplaints regarding the degree of an expert's knowledge go more to the weight of the evidence than to its admissibility."  (*People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1080 (*Tuggle*) [crime lab employee who was not a criminalist but had attended several fingerprint identification courses and had worked in lab examining and processing fingerprints was qualified to testify as expert in fingerprint identification].)

2. Evidence Code Section 402 Hearing

The prosecution filed a motion in limine seeking to introduce expert testimony regarding intimate partner battering and its effects and designated Rivera as its expert

---

[6] In *People v. Williams* (1992) 3 Cal.App.4th 1326, 1334-1335, the court reached a different conclusion about the qualifications of a police officer who offered an expert opinion about the relationship between alcohol ingestion and horizontal gaze nystagmus.

witness. Defense counsel objected and the court held a hearing under Evidence Code section 402 to determine Rivera's qualifications.[7]

Rivera testified that before he began working as a senior inspector with the district attorney's office a year and a half before the trial, he had been an officer with the Concord Police Department for 18 years. His assignments there included patrol, the juvenile bureau, the sexual assault unit as a detective, the homicide and domestic violence unit as a detective, and the special victims unit as a detective for domestic violence. He worked as a detective on domestic violence cases from 2006 to 2011 and had received formal training in domestic violence: basic training at the police academy, certified domestic violence training on a yearly or bi-yearly basis from the detective in the unit, two "very comprehensive" schools that covered domestic violence, as well as schools covering domestic violence as part of courses on sexual assault and homicide, and a one-week course on the specific subject of domestic violence. Rivera had read binders, leaflets and manuals on the effects of intimate partner battering. He became a certified trainer on domestic violence and in 2007 was responsible for training the officers and dispatchers in the department on that subject. He had been found qualified to testify as an expert in intimate partner battering in two previous trials.

While working as a patrol officer, Rivera handled about 2,000 cases involving domestic violence. As a detective, he did follow-up interviews with more than 3,000 persons who were alleged victims of domestic violence. More than half of these individuals had allegedly been abused more than once by the same batterer. Over 95 percent of the alleged domestic violence victims Rivera had interviewed were initially cooperative with law enforcement but became uncooperative.

Rivera explained that after an incident of violence, the victim might feel she was responsible for being beaten; she might receive threats or pressure from the batterer or his

---

[7] The prosecution additionally sought to call Rivera as an expert on strangulation injuries based on his experience investigating such cases. The court found he was not qualified to testify as an expert on that subject, which required medical knowledge and training.

family; and she might lack the financial resources to leave the relationship, all of which could contribute to a decision to recant or stop cooperating in the prosecution. Domestic violence victims were unlike most other crime victims because of the bond they have with their batterer. Because of the cycle of violence in a typical battering relationship, the victim would want to make things better for herself and the batterer by not pressing charges. In Rivera's opinion, not all victims of domestic violence suffer from the symptoms of intimate partner battering.

Rivera acknowledged he did not have a degree in psychology or medicine and had not read articles or books on the psychology of intimate partner battering and its effects. He did not know whether the effects of intimate partner battering amounted to a psychological or psychiatric disorder.

The trial court ruled that Rivera could testify as an expert on intimate partner battering and its effects, "limited to the relationship between the cycle of violence and a potential or alleged victim of domestic violence's initially being cooperat[ive] and not being cooperative later." Rivera was not to mention threats as a reason a victim might change her mind about cooperating, as there was no evidence of threats being made in this case.

Rivera testified before the jury, as more completely outlined in the previous section of this opinion, discussing the cycles of violence and stating some of the reasons an initially cooperative victim of domestic violence might recant or become uncooperative. The court gave CALCRIM No. 850, advising the jury it could not consider Rivera's testimony as proof that appellant had committed the charged crimes and could "consider the evidence only in deciding whether or not Liliana Acosta's conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony."

3. Analysis

Appellant does not dispute the relevancy of intimate partner battering and its effects on the issue of Acosta's credibility. Acosta initially reported an incident of

10

domestic violence by calling 911 and gave a statement at the scene that appellant had assaulted her, but during her preliminary hearing testimony (which was introduced at trial) she claimed she had been drunk and had instigated the physical confrontation. Her credibility was clearly at issue, and evidence that it was common for a woman who had been battered by an intimate partner to recant or stop cooperating with the police was relevant and admissible to explain her motives and to reconcile the inconsistencies between her initial statements to police and her preliminary hearing testimony. (See *Gadlin*, *supra*, 78 Cal.App.4th at p. 594; *Morgan*, *supra*, 58 Cal.App.4th at p. 1215.)

Rivera's testimony on intimate partner battering and its effects was specifically aimed at debunking the myths regarding the behavior of people abused by their spouses or domestic partners. His experience as a police officer and a detective who had received special training on domestic violence and had interviewed thousands of victims in such cases qualified him to testify about the cycle of violence, the behavior of victims caught in this cycle, and reasons such victims might recant or cease cooperating in the criminal prosecution of their abuser. Although Rivera noted there were "psychological conditions" at play, his testimony was based on his real-world experience with domestic violence cases, and did not invade the sphere of the psychologist or psychiatrist by offering a medical opinion or diagnosis. The defense was able to demonstrate through cross-examination that Rivera was not trained in psychology and did not understand the dynamics of intimate partner battering on that level. But this went to the weight of his testimony rather than its admissibility. (See *Tuggle*, *supra*, 203 Cal.App.4th at p. 1080; *People v. Dunnahoo* (1984) 152 Cal.App.3d 561, 577 [police officers who qualified as experts in the field of child molestation properly testified that children find it difficult to discuss sexual acts with adults].)

Appellant argues that the effects of intimate partner battering constitute a psychological disorder and that consequently, only mental health professionals such as psychiatrists, psychologists and counselors have the qualifications to testify as experts on that subject. We are not persuaded. Evidence Code section 1107, subdivision (a) originally referred to "battered women's syndrome" before it was amended to substitute

11

the phrase "intimate partner battering and its effects." (Stats. 2004, ch. 609, § 1.) The latter term reflects a more contemporary understanding of the phenomenon. (*Walker*, *supra*, 147 Cal.App.4th at p. 536, fn. 1.) Though the theory of "battered women's syndrome" as originally conceived relied on the psychological concept of "learned helplessness" to explain the behavior of women who would not leave abusive relationships, that aspect of the theory "has been criticized as lacking empirical support [citation], and as demeaning to women [citation]. In particular, many critics assert that victims of domestic violence do not typically suffer from a pathological condition [citation]." (*Brown*, *supra*, 33 Cal.4th at p. 900; see *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083-1084, fn. 3 (*Humphrey*).)

Rivera did not offer an opinion that encompassed the psychological aspects of intimate partner battering. Rather, he described the typical dynamic between abusers and their victims and the behaviors commonly exhibited by victims in response to the abuse. A degree in psychology was not a prerequisite to understanding this dynamic; indeed, it is not settled that the effects of intimate partner battering constitute a "syndrome" or a psychological disorder. (*Brown*, *supra*, 33 Cal.4th at p. 900.) Certainly, psychologists and psychiatrists who have treated domestic violence victims or studied the subject may testify as experts on the effects of intimate partner battering, but this does not mean they are uniquely qualified to do so, at least with respect to certain aspects of the phenomenon. The trial court did not abuse its discretion when it determined Rivera had the "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relate[d]." (Evid. Code, § 720, subd. (a).)

Our opinion should not be construed to mean that law enforcement officers, even those experienced in handling domestic violence cases, are qualified to testify about the more purely psychological aspects of intimate partner battering. (See *Humphrey*, *supra*, 13 Cal.4th at pp. 1078-1079 [psychologist testified " 'battered women who kill in self-defense their abusers, it's always related to their perceived change of what's going on in a relationship. They become very sensitive to what sets off batterers. They watch for this stuff very carefully. [¶] . . . Anybody who is abused over a period of time becomes

sensitive to the abuser's behavior and when she sees a change acceleration begin in that behavior, it tells them something is going to happen . . ."].)  In this case, Rivera's testimony focused on the behaviors of domestic violence victims rather than psychological conditions, and did not exceed the scope of his expertise.

### B.  *Multiple Convictions*

Appellant was initially charged with two crimes arising out of the same incident: inflicting corporal injury on a spouse and assault by means of force likely to cause great bodily injury.  (Pen. Code, §§ 273.5, subd. (a), 245, subd. (a)(4).)  The jury acquitted him of the charged offenses but convicted him of misdemeanor spousal battery, misdemeanor battery, simple assault as a lesser included offense of the corporal injury count, and an additional count of simple assault as a lesser included offense of assault by means likely to cause great bodily injury.  (Pen. Code, §§ 240, 242, 243, subd. (e)(1).)  The parties agree that the simple battery and simple assault counts must be reversed as lesser included offenses of spousal battery.

A defendant may not stand convicted of both a greater and a lesser included offense.  (*People v. Moran* (1970) 1 Cal.3d 755, 763.)  "If the evidence supports the verdict as to a greater offense, the conviction of that offense is controlling, and the conviction of the lesser offense must be reversed."  (*Ibid*.)  The result is the same when the defendant is convicted of multiple lesser included offenses that are also lesser included offenses of each other.  (See *People v. Eid* (2014) 59 Cal.4th 650, 656.)  Simple battery and simple assault are lesser included offenses of spousal battery.  (See *People v. Yeats* (1977) 66 Cal.App.3d 874, 878; *Cisneros-Perez v. Gonzales* (9th Cir. 2006) 465 F.3d 386, 395 & fn. 1.)  The judgment must be modified to reverse appellant's convictions for simple battery and simple assault.

Although our reversal of the simple battery and simple assault counts does not affect appellant's time in custody or the other terms of his probation, it does affect the assessments he is obligated to pay.  The trial court ordered appellant to pay a court operations assessment of $160 under Penal Code section 1465.8, subdivision (a)(1),

13

which requires an assessment of $40 for each conviction of a criminal offense, and a court facilities assessment fee of $120 under Government Code section 70373, subdivision (a)(1), which requires an assessment of $30 for each misdemeanor offense. The parties agree that these assessments must be reduced to $40 and $30, respectively, the amounts allowed for a single misdemeanor conviction.

## DISPOSITION

Appellant's conviction of simple battery under Penal Code section 242 (a lesser included offense of count 1) and his two convictions of simple assault under Penal Code section 240 (lesser included offenses under counts 1 and 2) are reversed. The judgment is modified to reduce the court operations assessment under Penal Code section 1465.8, subdivision (a)(1), to $40, and the court facilities assessment under Government Code section 70373, subdivision (a)(1), to $30. As so modified, the judgment is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

14