Filed 10/14/24  P. v. Reed CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TYRONE EUGENE REED,<br><br>    Defendant and Appellant. | D084259<br><br><br>(Super. Ct. No. BLF2000090) |

APPEAL from a judgment of the Superior Court of Riverside County, Rene Navarro, Judge.  Affirmed with directions.

Stephanie M. Adraktas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn A. Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Tyrone Eugene Reed of mayhem, inflicting corporal injury on a current or former significant other, first degree burglary,

interfering with the use of a wireless device, battery, and felony vandalism. The charges stemmed from physical violence perpetrated by Reed against the mother of his child, and Reed's conduct surrounding his arrest. Following his conviction, the trial court sentenced him to 20 years in state prison.

Reed appeals from the judgment and asserts several claims of instructional error. First, he argues the trial court failed to properly instruct the jury as to the elements of mayhem. Next, Reed contends the court should have provided a pinpoint instruction related to his defense to the burglary charge, and his counsel was constitutionally ineffective for failing to request this instruction. Finally, he makes several claims of error pertaining to the vandalism instructions, including: the jury instructions permitted the jury to aggregate the amount of damage from separate incidents of vandalism; the court should have instructed the jury on the lesser included offense of misdemeanor vandalism; and the court failed to provide a unanimity instruction.

Reed also asserts errors pertaining to admitting evidence relevant to the domestic violence charge. He argues the court abused its discretion in allowing expert testimony related to "domestic battering" because the investigator who offered the testimony was unqualified to do so. Additionally, he contends the court improperly admitted evidence of a prior act of domestic violence under Evidence Code section 1109 without first weighing the probative value against its prejudicial effects.

In his final claim, submitted in his supplemental opening brief, Reed argues the court should have stayed punishment for his burglary conviction pursuant to Penal Code section 654.[1] According to Reed, he could not be

---

[1] Further unspecified statutory references are to the Penal Code.

2

punished for both burglary and mayhem because the mayhem offense was the intended felony underlying the burglary charge.

As we shall discuss, we find no prejudicial error. However, we direct the trial court to correct the abstract of judgment, but otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2017 or 2018, Reed and Jane Doe[2] began an "off and on" dating relationship for approximately two or two and a half years. By July 2020, they had a two-year-old son and Doe was seven and a half months pregnant with their second child. Doe lived with their son in a two bedroom apartment located in Blythe, California.

On July 10, 2020, Doe and Reed attended a "well-baby checkup" appointment together. Reed brought Doe items for the baby, including diapers, bottles, and clothing. Although Doe and Reed had a "positive" experience that day, Doe did not have plans to see Reed at her apartment later that evening. According to Doe's statement to the police, she and Reed were separated at the time.

During the evening after the pregnancy check-up, Doe was asleep in her bedroom when she woke to the sound of loud knocking. As Doe reached to unlock the door, Reed kicked or pushed in the door, causing damage to the doorframe. Reed yelled and cursed at Doe and entered the apartment. Doe saw something in Reed's hand, but during her trial testimony, she couldn't remember what it was.

---

[2] We refer to the victim as Jane Doe to protect her privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

Doe felt scared and walked out of the apartment to call the police. Reed followed Doe outside. While Doe was on the phone with a 911 operator, Reed "snatched" the phone from her hand and threw it.

Reed then tried to stab Doe with a knife. Doe grabbed the knife in an attempt to stop it from hitting her stomach. According to Doe, but for grabbing the knife, Reed would have stabbed her in the stomach. Doe feared for her life and the life of her unborn child in that moment. When Doe grabbed the knife, she suffered two wounds to her right hand. She attempted to stop the bleeding to her hand with her shirt, which became "soaked from the blood" as a result.

Doe then tried to walk up a stairwell, but Reed grabbed her ankle causing her to fall down three or four steps. Reed slapped Doe in the face with an open hand, and he walked back into Doe's apartment. Doe went to a neighbor's apartment to seek help, and the neighbor gave her a towel to stop the bleeding to her hand. Law enforcement and paramedics arrived shortly afterward.

A paramedic who arrived on-scene contacted Doe, observing a "full thickness laceration" to the inside of Doe's right thumb. This type of laceration occurs when the fatty and muscular tissue is exposed. The pad of her middle finger was "almost completely removed and holding on by just a little bit of flesh." The paramedic attempted to control the bleeding and transported Doe to the hospital by ambulance.

At the hospital, physicians reattached Doe's fingertip to her middle finger with stitches. The physicians grafted skin from her upper arm onto

her right hand to treat the wound to her thumb. Doe suffered permanent scarring on her right thumb and middle finger from her injuries.[3]

Both at her apartment complex and the hospital later, Doe gave statements to the police. She stated that Reed never lived with her, and he "would just visit" her apartment. According to Doe, they separated around two weeks or a month before the instant offense, and she had "no idea" where Reed currently resided. Doe told the officers Reed was not "allowed over [at her] house at all," and he was not invited to her apartment that evening.

During the incident, the onsite property manager for Doe's apartment complex woke to the sounds of yelling and screaming. From her window, the manager told the people outside to "be quiet or to keep it down." Reed started yelling and cursing at the manager, and she responded saying she would call the police. Reed told the manager he would find her, and that she should "go back [to] where [she] came from."

Reed then walked away, and the manager heard more arguing. The manager heard a "slap noise," and she observed Reed walk around the building with a "big machete type of knife." She saw Reed use the knife to break three apartment windows. The property manager estimated the cost to "fix or repair" each window was $150.

A City of Blythe police officer[4] arrived at the scene around 1:30 a.m. Reed approached the officer with blood on his hands and asked to be arrested. The officer placed Reed in the back of his patrol car, and Reed "started kicking it and bashing his head" against the plexiglass divider between the

---

[3]    Photos of Doe's injuries were admitted into evidence and shown to the jury during trial. We have reviewed them in deciding this appeal.

[4]    At the time of trial then-Officer Julian Sandoval worked as a deputy sheriff in the County of El Dorado.

5

front and back seats of the car. Reed yelled profanities and kicked the car door with enough force to shift the car back and forth. Reed caused damage to the rear passenger door of the patrol car and the plexiglass divider.

When the deputy opened the door to the patrol car to tell Reed to stop, Reed lunged towards the officer, falling to the ground. Additional officers arrived on scene and remained with Reed while the initial responding officer investigated. Officer Sandoval observed traces of blood throughout Doe's apartment and shattered windows on the south side of the complex. The door to Doe's apartment was off its hinge and there was a footprint on the door. The officer found Doe's cellphone in a field near the apartment building and a knife with a 10-inch blade. There were blood droplets near the knife.

An officer transported Reed to a nearby hospital while a crime scene technician was dispatched to photograph him. Reed was uncooperative, stating he wanted to go to jail. He told the technician he did not want to be photographed, and as she turned to face Reed with her camera, he spit on her from around three feet away. Reed continued to yell, curse, and behave aggressively with the officers at the hospital.

The Office of the Riverside County District Attorney charged Reed with attempted murder (§§ 664, 187, subd. (a); count 1), attempted murder of a fetus (§§664, 187, subd. (a); count 2), mayhem (§ 203; count 3), inflicting corporal injury on a current or former significant other (§ 273.5, subd. (a); count 4), burglary of an inhabited dwelling (§ 459; count 5), felony vandalism (§ 594, subds. (a)–(b)(1); count 6), battery (§ 242; count 7), and interference with the use of a wireless communication device (§ 591.5; count 8). The information also alleged Reed was armed with a deadly weapon during the commission of counts 1 through 4 (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)), that he personally inflicted great bodily injury during the

6

commission of count 4 (§§ 12022.7, subd. (e), 1192.7, subd. (c)(8)), and that another person was present in the home during the commission of count 5 (§ 667.5, subd. (c)(21)).  Moreover, the information alleged Reed was previously convicted of a serious felony (§§ 667, subd. (a)(1), 668, and 1192.7, subd. (c)) that qualified as a strike prior (§§ 667, subds. (b)–(i), 1170.12), and that Doe was particularly vulnerable within the meaning of the California Rules of Court, rule 4.421(a)(3).

The jury found Reed not guilty of the attempted murder charges (counts 1 & 2), but it found him guilty of the remaining counts (counts 3–8).  The jury found true the allegations attached to counts 3 through 8 and also found true that Doe was a particularly vulnerable victim. In a bifurcated proceeding, Reed admitted he suffered a serious felony prior and strike prior conviction.

At sentencing, the court dismissed the allegation Reed suffered a serious felony prior conviction, but the court declined to dismiss the strike prior pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. The court sentenced him to 20 years in prison as follows:  eight years, doubled due to his strike prior, for a total of 16 years (count 3); three years eight months, stayed pursuant to section 654 (count 4); two years eight months, consecutive (count 5); one year four months, consecutive (count 6); six months, concurrent (count 7); and six months, concurrent (count 8).  The court struck the finding Reed was armed with a knife (§ 12022, subd. (b)(1)) pursuant to section 1385.

DISCUSSION

I.

*The Mayhem Jury Instruction*

Reed contends the trial court prejudicially misinstructed the jury on the elements of mayhem. According to Reed, the court's modifications to the standard mayhem instruction, CALCRIM No. 801, expanded the scope of the offense to make evidence of Doe's injuries per se proof of mayhem. The Attorney General concedes the instruction was faulty, but argues the error was harmless and therefore does not require reversal. We agree that an aspect of the instruction was erroneous but conclude the error was harmless.

A.    *Additional Background*

At the end of trial, the court provided a modified version of CALCRIM No. 801. The instruction provided, in relevant part, that proving the offense of mayhem required the prosecution to prove Reed unlawfully and maliciously: "One, removed a part of someone's body; two, disabled or made useless a part of someone's body and the disability was more than slight or temporary; three, permanently disfigured someone; or four, slit someone's middle finger tip."

During closing argument, the prosecution argued Reed was guilty of mayhem if he "unlawfully and maliciously did any one of those four things: Removed a part of somebody's body, disabled or made useless a part of someone's body and the disability was more than slight or temporary, permanently disfigured someone, or basically slit somebody's middle finger tip to the point of almost being off." The prosecution emphasized that the scars on Doe's fingertip and thumb were permanent and argued those injuries were "disfiguring." Defense counsel did not address whether the

8

injuries to Doe's hand were disfiguring, but instead argued Reed's intent had not been proven because Doe grabbed the weapon Reed wielded.

B.      *Analysis*

Section 203 provides, "[e]very person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." This statute "generally prohibits six injurious acts against a person, three that specify a particular body part and three that do not: (1) dismembering or depriving a part of someone's body; (2) disabling or rendering useless a part of someone's body; (3) disfiguring someone; (4) cutting or disabling the tongue; (5) putting out an eye; and (6) slitting the nose, ear or lip." (*People v. Santana* (2013) 56 Cal.4th 999, 1003.) At common law, this offense was designed to prohibit the infliction of injuries that reduced the victim's " 'formidability in combat,' " but the offense was expanded in California to include "mere disfigurement." (*People v. Keenan* (1991) 227 Cal.App.3d 26, 33–34.)

"Disfigurement of the body ' "impairs or injures the beauty, symmetry or appearance of a person or thing . . . [or] renders unsightly, misshapen or imperfect or deforms in some manner." ' [Citation.] To prove mayhem based on a disfiguring injury, the injury must be permanent." (*People v. Romero* (2019) 44 Cal.App.5th 381, 387.) Although not every " 'visible scarring wound' " is sufficient to constitute mayhem (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1559–1560), evidence of "permanent" scarring may be sufficient to prove the offense (*Romero*, at p. 387).

Here, the jury instructions enumerated the ways in which mayhem may be committed in the disjunctive. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1299 [the use of "or" between enumerated paragraphs in jury

9

instructions is disjunctive rather than conjunctive].)  The third enumerated paragraph of the instruction required the prosecution to prove Reed permanently "disfigured" someone.  The trial court modified the fourth enumerated paragraph to permit the jury to find Reed guilty if he unlawfully and maliciously "slit [Doe's] middle finger tip."  Because the instructions were in the disjunctive, the fourth paragraph improperly omitted the element that the injuries to Doe's hand—an area of the body other than her tongue, nose, ear, or lip—must have been disabling or disfiguring.  The Attorney General and Reed agree this omission was erroneous.

Reviewing the jury instructions de novo, we agree with the parties that the instruction erroneously omits a required element of the offense; the injuries to Doe's finger and thumb must have been "disfiguring" under section 203.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 ["We determine whether a jury instruction correctly states the law under the independent or de novo standard of review."].)  The parties disagree, however, regarding whether the faulty instruction was prejudicial.  The Attorney General argues the jury would have reached the same verdict absent the instructional error, and therefore the error is harmless.  Reed contends the conviction must be reversed because the effect of the instructional error was to create a mandatory presumption of guilt, and the record does not otherwise include overwhelming evidence to support the verdict.  We find the Attorney General's argument persuasive and conclude the error was harmless.

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.  [Citation.]  [A failure to instruct on the elements of the offense] is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and

10

California Constitutions guarantee.  [Citations.]  All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)

Nonetheless, " '[t]he omission of one or more elements of a charged offense . . . is amenable to review for harmless error under the state and federal Constitutions . . . .'  [Citation.]  'A trial court's failure to instruct the jury on all of the essential elements of the charged offense is reviewed for harmless error according to the standard set out in *Chapman v. California* (1967) 386 U.S. 18, 24 . . . .'  [Citation.]  Under the *Chapman* standard, an error is prejudicial and requires reversal of the conviction unless it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  [Citation.]  Accordingly, the error ' "will be deemed harmless only in unusual circumstances, such as where each element was undisputed, the defense was not prevented from contesting any [or all] of the omitted elements, *and* overwhelming evidence supports the omitted element." ' "  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 679.)

Here, we find such unusual circumstances for two reasons.  First, the defense was not prevented from contesting the omitted disfigurement element.  During closing argument, the prosecution repeatedly argued Doe's injuries were disfiguring.  Defense counsel did not contest the prosecution's contentions regarding the disfigurement element during their closing argument.  Instead, counsel argued the evidence showed Reed lacked the specific intent to commit mayhem because it was Doe who "grabbed the knife."  Thus, although the defense could have contested the disfigurement elements during trial and in closing argument, they elected instead to focus on Reed's intent and Doe's actions causing the wounds:  "[the injuries] are

11

consistent with [Doe] trying to pull . . . a sharp object, and it . . . [flayed] the edge of [Doe's] thumb and the fingertip."

Next, overwhelming evidence supports a conclusion that Doe's injuries were "disfiguring" within the meaning of section 203. The trauma from these injuries was significant; Doe received stitches to reattach her fingertip. Reed's knife also sliced open Doe's thumb almost the thumb's entire length. The incision went through the muscle layer beneath the skin almost to the bone. Doe required a skin graft to repair her thumb. These medical interventions to Doe's wounds are evidence of the severity of the wounds, and as we discuss below, the evidence at trial demonstrated the permanence of these injuries.

To support the argument that Doe's injuries were permanently disfiguring, the Attorney General cites to cases in which a "single small scar" was sufficient to sustain a mayhem conviction so long as the scarring was permanent. The Attorney General relies extensively on *People v. Keenan* (1991) 227 Cal.App.3d 26 (*Keenan*). Reed argues that reliance on these cases is misplaced because they apply the substantial evidence standard of review, rather than the overwhelming standard applicable to review of the instructional error in this case. Although we agree these cases largely involve an analysis of the sufficiency of the evidence under the substantial evidence standard of review, we nonetheless find their facts useful to our analysis.

In *Keenan*, the defendant committed a "grotesque" assault on the victim. (*Keenan, supra*, 227 Cal.App.3d at pp. 29, 36.) During the attack, he strangled and sexually assaulted her, and he burned both of her breasts with a lit cigarette. (*Id.* at p. 29.) The scars from the cigarette burns were visible at the preliminary hearing three and a half months after the assault. (*Ibid.*)

12

The reviewing court in *Keenan* concluded substantial evidence supported the defendant's conviction for mayhem. (*Keenan, supra*, 227 Cal.App.3d at p. 36.) In reaching its conclusion, the court explained, "[i]n the absence of any evidence to the contrary, we assume that the scars [the victim] suffered, which remained three and one-half months after the attack, were permanent. [Citations.] The fact it might be medically possible to remove the scars, which is also not shown by the record in this case, would in any event be insufficient to alleviate the offense." (*Id.* at p. 36, fn. 6.)

Similar to *Keenan,* here, Doe testified she had "permanent" scars or injuries from Reed's attack, and she described those scars to the jury. Doe's testimony took place over *two years* after she sustained her injuries. The permanency of her injuries was evident from their visibility during Doe's testimony years after the attack. Thus, even applying the more stringent *Chapman* standard here, we conclude overwhelming evidence supports the disfigurement element and the instructional error was harmless.

## II.

### *The Burglary Jury Instruction*

Reed next contends the trial court should have instructed the jury that he could not be found guilty of burglarizing his own residence. Although he acknowledges his counsel did not request such an instruction, Reed contends this resulted in constitutionally ineffective assistance of counsel. As we discuss, even assuming arguendo defense counsel's performance was deficient for failing to request this instruction, there is no reasonable probability Reed would have obtained a more favorable result absent the error. Accordingly, the conviction shall be affirmed.

A.    *Additional Background*

During the jury trial, Doe testified inconsistently regarding whether Reed resided with her.  She initially testified that she and Reed "lived together," but then stated Reed only sometimes "stayed" in her apartment and kept some of his belongings there.  According to Doe, Reed used her residence as his mailing address, but he was not on the lease and did not have a key to the apartment.  Doe also stated in her trial testimony that her son was the only person residing with her at the time of Reed's arrest in July 2020, but she indicated that Reed did not need her permission to "come back" to the apartment.  Doe was not "expecting [Reed] to come over" on the night of his July 2020 arrest.

The property manager of Doe's apartment complex confirmed Reed was not on Doe's lease.  She did not believe Reed lived in Doe's apartment, but she acknowledged that he visited often.  Because of Reed's frequent visits to the apartment, the property manager issued Doe an inquiry to provide proof Reed was not residing with her.  The manager was required to issue such an inquiry when someone visited the complex for more than 10 days.

Following the close of the prosecution's case, Reed moved to dismiss the burglary charge pursuant to section 1118.1.  Reed argued he could not be guilty of burglarizing his own home, and the evidence demonstrated he was living in Doe's apartment when the offense occurred.  The court found sufficient evidence supported a burglary conviction and denied the motion.

The court instructed the jury with the elements of burglary by providing CALCRIM No. 1700.  The instruction provided, in relevant part, Reed was guilty of burglary if the prosecution proved:  (1) Reed entered a building; and (2) when he entered the building, he intended to commit attempted homicide or felony domestic violence or mayhem.  Defense counsel

14

did not object to the instruction as given and did not request a pinpoint instruction.

During closing argument, the prosecution agreed with Reed's counsel that if Reed lived in Doe's apartment at the time of his entry into the residence, he could not be found guilty of burglarizing Doe's home. However, the prosecution argued the evidence showed Reed did not reside in Doe's apartment when he committed the charged acts. The prosecution pointed to multiple statements by Doe to the responding police officers that Reed was not living in her residence. Additionally, the prosecution emphasized that Reed did not have a key to the apartment, and Doe locked the door on the night of the charged incident and was not expecting him there. Defense counsel contended the evidence demonstrated that Reed and Doe "shared" the home, arguing that his belongings were in the residence and Doe expected Reed to return at some point.

B.    *Analysis*

"Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case . . . .' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 348–349.) These instructions " 'are not required to be given *sua sponte* and must be given only upon request. [Citations.]' " (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.) A defendant who fails to request such an instruction "forfeits the claim on appeal." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001.)

Here, the burglary instruction that Reed argues should have been given at trial—an instruction that would clarify a defendant may not burglarize his or her own residence—is a pinpoint instruction because it illuminates the crux of his defense. Specifically, the instruction focuses on Reed's claim that he resided with Doe at the time of the offense and therefore could not be

found guilty of burglary. Although Reed acknowledges he did not request a pinpoint instruction related to the burglary charge during trial, he argues his counsel was constitutionally ineffective for failing to do so. We disagree.

"An appellant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1146–1147, citing *Strickland v. Washington* (1984) 466 U.S. 668.) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) It is not necessary to determine whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id.* at p. 697.)

Here, the Attorney General does not dispute Reed's argument that an individual may not be convicted of burglarizing a residence in which she or he has an unconditional possessory interest. "To sustain a burglary conviction, the People must prove that a defendant does not have an unconditional possessory right to enter his or her family residence." (*People v. Davenport* (1990) 219 Cal.App.3d 885, 892.) However, the Attorney General argues there was no substantial evidence to support a pinpoint instruction on this defense. (See *People v. Ward* (2005) 36 Cal.4th 186, 214 [a pinpoint instruction must be given only if supported by substantial evidence].) If that is so, Reed's trial counsel's performance was not deficient for failing to object

16

to the instructions as given, nor can Reed establish prejudice for failing to request the pinpoint instruction.

On the facts before us, we agree that even had defense counsel successfully requested a pinpoint instruction informing the jury that Reed could not be convicted of burglarizing his own home, there is no reasonable probability of a more favorable outcome. (*People v. Foster* (2003) 111 Cal.App.4th 379, 383 [to demonstrate prejudice, defendant must show that, but for their counsel's unprofessional errors, a "determination more favorable to defendant would have resulted"].) We conclude Reed fails to demonstrate prejudice from the purported error and we need not determine whether his counsel's performance was deficient.

Our high court's decision in *People v. Gauze* (1975) 15 Cal.3d 709 is instructive to our analysis. In *Gauze*, the defendant and the victim were two of three people jointly residing in an apartment. (*Gauze*, at p. 711.) The defendant and the victim became involved in an argument, and the defendant later returned to the apartment and shot the victim. (*Ibid.*) On these facts, the *Gauze* court concluded the defendant could not be convicted of burglary because he was a joint occupant of the apartment. (*Id.* at p. 714.) In reaching its decision, the court held a "defendant cannot be guilty of burglarizing his own home." (*Ibid.*)

By contrast, in *People v. Sears* (1965) 62 Cal.2d 737,[5] the defendant moved out of a family home he shared with his wife and stepchildren. (*Id.* at p. 740.) Three weeks later, he entered the residence through an unlocked door, attacked his wife, and killed his stepdaughter. (*Id.* at pp. 740–741.) On appeal, our high court rejected the defendant's contention that the trial court should not have given a felony murder instruction based on burglary. (*Id.* at

---

[5] Overruled on other grounds in *People v. Cahill* (1993) 6 Cal.4th 478.

p. 746.)  In reaching this conclusion, the court stated, "[o]ne who enters a room or building with the intent to commit a felony is guilty of burglary even though permission to enter has been extended to him personally or as a member of the public.  [Citations.]  The entry need not constitute a trespass.  [Citations.]  Moreover, since defendant had moved out of the family home three weeks prior to the crime, he could claim no right to enter the residence of another without permission.  Even if we assume that defendant could properly enter the house for a lawful purpose [citation], such an entry still constitutes burglary if accomplished with the intent to commit a felonious assault within it."  (*Ibid.*)

The law pertaining to burglary after the court's decisions in *Sears* and *Gauze* is that "one may be convicted of burglary even if he enters [a residence] with consent, provided he does not have an unconditional possessory right to enter."  (*People v. Pendleton* (1979) 25 Cal.3d 371, 382; see also *People v. Salemme* (1992) 2 Cal.App.4th 775, 781 [a person who enters a residence "with the intent to commit a felony is guilty of burglary *except* when he or she (1) has an unconditional possessory right to enter as the occupant of that structure or (2) is invited in by the occupant who knows of and endorses the felonious intent"].)  Applying this principle to the facts of Reed's case, we conclude that although Doe may have consented to Reed's entry into the home at various points throughout their relationship, on the night of the charged incident the evidence demonstrated he did not have an unconditional possessory right to enter the apartment.

Supporting our conclusion, Doe told police she was separated from Reed and that he never lived with her.  She informed the officers she had no idea where he currently resided.  Reed was not allowed over at Doe's house "at all," nor was he invited to her home that evening.  Although Doe initially

testified that she and Reed lived together, she also testified that her son was the only person residing with her on the night of Reed's arrest and that Reed simply "stayed" with her. Reed did not have a key to the home, and the property manager confirmed Reed was not on Doe's lease.

These facts prove, at most, a *conditional* right to enter Doe's home rather than unrestricted possessory interest that would preclude a burglary conviction. Thus, even assuming the trial court would have been justified in providing a pinpoint instruction informing the jury that Reed could not burglarize his own home, the record does not demonstrate a more favorable verdict would have resulted. Reed has therefore not demonstrated prejudice from his counsel's failure to request the proffered pinpoint instruction, and he has not met his burden of proving ineffective assistance of counsel.

## III.

### *The Expert Testimony*

Reed next contends the trial court prejudicially erred by admitting expert testimony regarding "domestic battering." According to Reed, the investigator who proffered his opinion on the matter was unqualified. As we discuss, we find no abuse of discretion by the trial court by admitting this evidence.

A.     *Additional Background*

Riverside County Sheriff's Department Investigator Adonis Glasper testified as an expert regarding "Intimate Partner Battering Syndrome." Prior to the start of trial, the prosecution moved to qualify him as an expert. The defense objected to the admission of the testimony, arguing the disclosure of the expert was untimely and the proffered testimony was more prejudicial than probative.

19

The court conducted a hearing pursuant to Evidence Code section 402 to determine the admissibility of his testimony. At the hearing, Investigator Glasper described his training and education. He received 836 hours of training at the police academy, which included training on investigating and reporting domestic violence cases. The training also included 16 hours on crisis training, 40 hours of behavior analysis, eight hours on sexual assault investigation, 24 hours on crime scene investigation, and 40 hours on child abuse. He obtained a bachelor's degree in criminal justice and received 40 hours of training on cognitive interview techniques for victims, including victims of domestic violence. He also completed a domestic violence course titled "Heavy Hands."

On cross-examination, Investigator Glasper acknowledged he attended the police academy over twenty years ago, and many aspects of his training were not specific to domestic violence. His bachelor's degree did not have an emphasis on psychology, and he had not recently participated in formal research studies on intimate partner violence.

Turning to his experience, Investigator Glasper testified he had been a law enforcement officer for the past 24 years. During his time on patrol, he investigated "well over 100 cases" of domestic violence. He also provided approximately 200 hours of training to deputies regarding domestic violence. He is a "domestic violence station liaison," which means he coordinates with the prosecutor's office and provides training to deputies to ensure domestic violence victims are properly interviewed, evidence is collected correctly, and investigative reports are sufficiently detailed. As part of this role, Investigator Glasper reviews all domestic violence cases within his station to ensure the reports are accurate and the victims receive necessary resources.

Investigator Glasper stated he had previously testified in domestic violence cases approximately 50 times, and he had testified as an expert in domestic violence cases twice. He indicated he did not interview anyone involved in this case and had no specific knowledge of Reed and Doe's relationship. Investigator Glasper explained he did not receive specific information about the case because he was asked to testify as a neutral party to educate the jury on identifying domestic violence.

Following the Evidence Code section 402 hearing, the court overruled Reed's objection to the admission of Investigator Glasper's testimony. The court deemed him an expert in "Intimate Partner Battering Syndrome" and allowed him to testify. The court then provided the jurors with CALCRIM No. 332 to instruct them on how to evaluate expert testimony.[6]

During his testimony, Investigator Glasper described the "common characteristics" of victims and perpetrators of domestic violence. According to the investigator, victims of domestic violence are typically extremely reserved with family and friends, and they deny and minimize the abuse they have experienced. Perpetrators isolate victims from their family and friends and refuse to accept responsibility for their abuse.

---

[6]  The instruction provided: "[a] witness will be allowed to testify as an expert and to give an opinion. You must consider the opinion, but you are not required to accept it as true or correct. [¶] The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses, generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gives for any opinion and the facts or information on which the expert relied in reaching that opinion. [¶] You must decide whether the information, in which the expert relies is true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

21

Investigator Glasper also testified regarding the stages of "Intimate Partner [Battering] Syndrome." In one stage, the victim exhibits psychological and emotional effects of the abuse, including low self-esteem and suicidal ideation. The victim also feels guilt that the perpetrator's abuse and incarceration is her or his fault. The victim may move on to an "enlightenment phase" in which she or he realizes the situation and seeks help. In the final stage, the victim realizes she or he bears no responsibility for the abuse.

Investigator Glasper also described the "power and control wheel," which characterizes the phases of relationships involving domestic violence. He enumerated some, but not all, of the phases, including the economic abuse phase, the children manipulation phase, the "mine, myself, and denying phase," the phase in which the perpetrator uses coercion or threats, the honeymoon phase, and the apologetic phase. He testified that during the "honeymoon phase" the victim is least likely to report an incident of domestic violence. According to Investigator Glasper, victims of domestic violence commonly recant their accusations against the abuser out of guilt for breaking up the family unit, particularly when children are involved.

B.      *Analysis*

Under Evidence Code section 1107, subdivision (a), "[i]n a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." Section 1107, subdivision (b), instructs us that "[t]he foundation shall be sufficient for

22

admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on intimate partner battering and its effects shall not be considered a new scientific technique whose reliability is unproven."

Witnesses are qualified to testify as experts if they have "special knowledge, skill, experience, training, or education sufficient to qualify [them] as an expert on the subject to which [their] testimony relates." (Evid. Code, § 720, subd. (a).) "Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion [is] shown." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.) "[C]omplaints regarding the degree of an expert's knowledge go more to the weight of the evidence than to its admissibility." (*People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1080 (*Tuggle*).)

Here, Reed does not dispute the relevance of Investigator Glasper's testimony regarding intimate partner battering and its effect on Doe's testimony and her credibility. He contends, however, that the investigator lacked the qualifications to render expert testimony on this issue because his training and experience focused on "general criminal justice and not domestic violence specifically." Moreover, according to Reed, Investigator Glasper's "perspective was necessarily biased" because all of his experience consisted of assisting in the prosecution of domestic violence cases. We disagree.

Contrary to Reed's assertions, Investigator Glasper testified that much of his experience as a law enforcement officer focused on investigating allegations of domestic violence. At the time of his testimony, he served as the "domestic violence station liaison." As part of this role, he provided

23

training to deputies regarding the proper investigation of these cases, and he conducted follow-up investigation on matters involving domestic violence. He investigated "well over 100 cases" involving domestic violence and testified in over 50 of those cases.

Reed's argument that Investigator Glasper's experience and training focused too broadly on investigating crimes generally rather than specifically on domestic violence cases goes to the weight of the testimony, not its admissibility. (*Tuggle, supra*, 203 Cal.App.4th at p. 1080.) And, in fact, during cross-examination, Investigator Glasper acknowledged that some training occurred over 20 years ago and that he did not have a degree in psychology. These facts were relevant to the jury's evaluation of the investigator's credibility and their assessment of the weight to give his opinions. These facts did not, however, support exclusion of Investigator Glasper's opinion regarding the behavior of domestic violence victims and perpetrators, which was based on his specific knowledge and experience observing these patterns.[7] Accordingly, giving the trial court wide latitude in determining Investigator Glasper's qualifications, as we must, we perceive no abuse of discretion in the trial court's decision to admit his expert testimony.

IV.

*Evidence of Prior Domestic Violence*

Reed argues the court prejudicially erred by admitting evidence of a prior act of domestic violence under Evidence Code sections 1101 and 1109 without first weighing its probative value against its prejudicial effect. According to Reed, the trial court was required to state its reasons for

---

[7] The authority Reed cites in his opening brief include cases in which psychologists or counselors were qualified to testify as an expert in intimate partner battering, but they do not stand for the proposition that these are the only backgrounds which may be qualified to testify in this area.

24

admitting the challenged evidence, but failed to do so. He emphasizes that the court did not mention Evidence Code section 352 in its ruling, nor did it make any statement regarding the prejudicial effect of the evidence.

A.    *Additional Background*

Prior to trial, the prosecution moved in limine to admit evidence of a prior act of domestic violence pursuant to Evidence Code sections 1101 and 1109. During the prior incident, Reed shot his former partner, Jane Doe 2, with a BB gun. Citing to Evidence Code section 352, the prosecution argued in their briefing that the evidence was highly probative and not unfairly prejudicial.

At the in limine hearing, the prosecution argued the evidence of the prior act involved an act of violence similar to the instant offense, and therefore it was admissible under Evidence Code section 1109. The prosecution also sought to introduce the evidence under Evidence Code section 1101 as evidence related to Reed's intent. Defense counsel objected to the admission of the evidence under Evidence Code section 352 because the evidence was more prejudicial than probative and would mislead the jury.

After considering the parties' arguments, the court admitted the evidence. The court commented that the prior act occurred within 10 years of the instant offense, and the evidence fell within the propensity exception the legislature established in Evidence Code section 1109. The court also ruled the evidence was relevant and admissible under Evidence Code section 1101, and the court commented that the jury would be instructed on how to properly consider the evidence.

During trial, Doe 2 described an act of domestic violence that Reed committed against her in 2014. According to Doe 2, Reed lived two doors away from the home she shared with her mother. Doe 2 dated Reed for

25

around two or three years until she broke up with him.  After the break-up, Reed broke a window to Doe 2's house.

On July 30, 2014, Doe 2 was standing in the back of her apartment complex with her friend and her friend's nephew when she encountered Reed. He jumped out of a bush and took a BB gun out of his backpack.  Reed shot Doe 2 around seven or eight times and said "[n]ow call the cops bitch."  Doe 2 testified she went to the hospital to have the pellets removed from her back, and one of the BBs is still lodged in her body.  Visible scars from Doe 2's injuries remain even now.

B.    *Analysis*

Under Evidence Code section 1109, subdivision (a)(1), "evidence of the defendant's commission of other domestic violence" is admissible to establish the defendant's propensity to commit such acts "in a criminal action in which the defendant is accused of an offense involving domestic violence."  This evidentiary rule functions as an exception to the general prohibition against character evidence to prove a defendant's conduct on a specific occasion.  (See Evid. Code, § 1101, subd. (a) ["evidence of a person's character or trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion"].)  However, evidence of the defendant's commission of other acts of domestic violence is not admissible under Evidence Code section 1109 if the evidence is inadmissible under Evidence Code section 352. (Evid. Code, § 1109, subd. (a).)  Moreover, under Evidence Code section 1101, evidence of a prior act is admissible to prove, among other facts, a defendant's intent.  (Evid. Code, § 1101, subd. (b).)  This evidence also requires a section 352 analysis before it is admissible.

Evidence Code section 352 provides, in relevant part, "[t]he court in its discretion may exclude evidence if its probative value is substantially

26

outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." When determining the admissibility of evidence under section 352, "trial judges must consider such factors as [the prior act's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

Reed avers in his opening brief on appeal that the trial court "*must* state its reasons for admitting challenged evidence on the record." Not so. Our high court has made clear that, on review, we may " 'infer an implicit weighing by the trial court on the basis of record indications well short of an express statement.' " (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1168; *People v. Triplett (*1993) 16 Cal.App.4th 624, 628–629 ["a trial court need not expressly state that its ruling is based on a weighing of prejudice against probative value so long as the record otherwise shows 'that the trial court understood and undertook its obligation to perform the weighing function prescribed by Evidence Code section 352' "].)

Here, prior to the court's ruling, the parties argued at length about the probative value of the evidence versus its prejudicial effect. The briefing submitted prior to the hearing also discussed Evidence Code section 352. In issuing its decision, the trial court referenced one of the factors related to

prejudice under Evidence Code section 352—remoteness—and found the prior act was committed within 10 years of the charged offense and was therefore admissible under Evidence Code section 1109. The court also found that Evidence Code section "1109 allow[ed]" the introduction of the evidence. The text of Evidence Code section 1109 expressly references Evidence Code section 352. (See Evid. Code, § 1109, subd. (a)(1) ["evidence of the defendant's commission of other domestic violence is not made inadmissible by [s]ection 1101 if the evidence is not inadmissible pursuant to [s]ection 352"].)

Accordingly, even though the trial court did not mention Evidence Code section 352 by name, the court's comments, and the context in which they were made, create an inference that the court considered it, properly weighed the evidence's probative value against the dangers of undue prejudice to the defendant, and then exercised its discretion. We therefore find no merit to Reed's argument that the court improperly failed to conduct an Evidence Code section 352 analysis or place its findings on the record.

## V.

### *The Vandalism Conviction*

Reed advances three claims of prejudicial error related to his conviction for felony vandalism (count 6), and he asks this court to reverse the conviction or reduce it to a misdemeanor. First, Reed argues the trial court's valuation jury instruction improperly permitted the jury to aggregate the damage from separate and distinct acts of vandalism. Next, Reed contends the court failed to instruct the jury as to the lesser included offense of misdemeanor vandalism. In his final claim, Reed argues the court should have, but did not, provide a unanimity instruction.

28

Reviewing Reed's instructional claims of error de novo, we conclude the purported errors were harmless. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*) [we review assertions of instructional error de novo].) In the following sections, we provide additional background regarding the vandalism instructions and the parties' arguments, and address Reed's claims in turn.

A. *Additional Background*

The trial court instructed the jury with the standard vandalism instruction, CALCRIM No. 2900. It provided, in relevant part, the prosecution needed to prove Reed: (1) maliciously damaged or destroyed real or personal property; (2) Reed did not own the property; and (3) the amount of the damage was over $400. Additionally, the court instructed the jury with CALCRIM No. 2901. Under this instruction, if the jury found Reed guilty of vandalism, they were also required to determine whether the prosecution proved the amount of damage was over $400. The record does not indicate Reed objected to the instructions as given or requested clarifying instructions.

During closing argument, the prosecution argued the evidence demonstrated the property damage Reed caused was over $400. They pointed to the property manager's testimony that the cost to repair the broken windows to Doe's apartment was $150 each, for a total of $450. The prosecution also asked the jury to factor in the damage to the police car, stating: "[t]hen you include the damage to the police vehicle. You didn't know how much the damage was to the vehicle. Now, we know we're well over $400." Reed argued the property manager's testimony was an "approximation" of the cost to repair the windows, and this evidence was insufficient to meet the People's burden.

29

The jury found Reed guilty of vandalism and found true the allegation the amount of damage was over $400.

B.    *Analysis*

1.    *Aggregation and Lesser Included Offense Instructions*

A "trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 118.) Misdemeanor vandalism[8] is a lesser included offense of felony vandalism because "a person cannot commit felony vandalism without also committing the lesser misdemeanor offense." (*Sangha v. LaBarbera* (2006) 146 Cal.App.4th 79, 87, fn. 6.) "[M]ultiple instances of misdemeanor vandalism can be aggregated to form a single felony, unless 'the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan.' " (*In re Arthur V.* (2008) 166 Cal.App.4th 61, 69 (*Arthur*).)

Here, according to Reed, the trial court failed to instruct the jury as to the lesser included offense of misdemeanor vandalism. Relatedly, he contends the court improperly permitted the jury to aggregate the damage amount from multiple incidents to meet the felony vandalism threshold. Reed acknowledges he did not request an instruction related to aggregation at trial, nor does the record reflect he objected to the instructions as given. However, Reed argues the issue was not forfeited because the court had a sua sponte duty to instruct as to any lesser included offense.

The Attorney General argues the court properly instructed the jury on misdemeanor and felony vandalism by providing CALCRIM Nos. 2900 and

---

8    Vandalism constitutes a misdemeanor offense unless the amount of damage is over $400. (§ 594, subd. (b)(1)–(2).)

30

2901.  According to the Attorney General, Reed forfeited his argument that the court should provide a pinpoint instruction related to the aggregation of separate incidents of vandalism.  But even assuming the claim was not forfeited, the purported error was harmless because the evidence showed the damage to Doe's windows was over $400, and therefore Reed has not demonstrated he would have received a more favorable result absent the error.

We agree that any error here was harmless.[9]  " 'The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, [836–837].  Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1267.)  Under this standard, a defendant must demonstrate it is "reasonably probable" the jury would have returned a more favorable verdict if the omitted lesser instruction had been given.  (*Ibid.*)

Here, the only witness to testify regarding the amount of damage, the apartment's property manager, opined that the value to repair the three windows Reed damaged was $150 each (for a total of $450).  No received evidence supported that the damage to Doe's apartment windows was less than $400.  Although Reed argued at trial that the property manager's

---

[9]    We agree with Reed, however, that the trial court misinstructed, and as given, the jury instructions did not permit the jury to find Reed guilty of misdemeanor vandalism if it found the $400 damage allegation untrue.  Indeed, the jury received no misdemeanor vandalism verdict form.  Further, the instructions did not give the jury an option to find that Reed committed vandalism in an amount under $400.  Nonetheless, for the reasons discussed in our analysis, we conclude the error is harmless because the only evidence regarding the amount of damage was that Reed vandalized Doe's windows in an amount over $400.

estimate was insufficient and unreliable, and he suggested the property manager was not credible, the jury rejected this argument by finding true the allegation that the damage was over $400. The testimony of one witness is sufficient to support a conviction, and here no evidence contradicted the property manager's opinion regarding the amount of damage. (*People v. Jones* (2013) 57 Cal.4th 899, 963 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."].) Accordingly, there is no reasonable probability the jury would have returned a misdemeanor guilty verdict had the trial court instructed the jury as he argues the court should have done.

Moreover, the case Reed cites in support of his claim that the court should have provided a clarifying instruction regarding aggregation involves multiple instances of *misdemeanor* vandalism that were aggregated to meet the felony threshold. (See *People v. Carrasco* (2012) 209 Cal.App.4th 715, 718 [prosecution aggregated an incident of vandalism valued at $382 with another incident valued at $265]; see also *Arthur, supra*, 166 Cal.App.4th at p. 65 [prosecution aggregated an incident of vandalism valued at $150 with another incident valued at $350].) This case does not involve a situation in which the prosecution attempted to aggregate the damage amount from multiple misdemeanor vandalism offenses to prove a felony offense. Rather, this case involved a single felony vandalism act where Reed smashed three apartment windows, each costing $150. The estimated damage for the first incident of vandalism was over the $400 felony threshold. Accordingly, the failure to provide clarifying instructions regarding aggregation is of no consequence.

In summary, we conclude Reed failed to meet his burden of demonstrating a reasonable probability the jury would have reached a more

favorable verdict absent the purported instructional errors. Indeed, jurors expressly found the amount of damage was over $400.

### 2. *Unanimity Instructions*

In his final claim of instructional error, Reed contends the prosecution relied on multiple incidents to convict him of a single count of vandalism, and therefore the trial court was required to provide a unanimity instruction. Reed points to the prosecution's comments during closing argument that Reed was guilty of vandalism because he broke the windows to Doe's apartment, *and* because he caused damage to the police car. According to Reed, because the People charged him with only one count of vandalism and the prosecution did not elect to rely on a single incident, the trial court should have instructed the jury as to the requirement of unanimity.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) "The unanimity instruction must be given sua sponte, even in the absence of a defense request to give the instruction." (*Hernandez, supra*, 217 Cal.App.4th at p. 569.) "There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time.' " (*Jennings*, at p. 679.)

33

The Attorney General argues the continuing course of conduct exception applies here, and therefore the trial court was not required to instruct on unanimity. We disagree. Reed's conduct prior to police intervention was a series of violent acts committed against Doe. When police arrived, he asked to be arrested and was placed in the back of a patrol car. Reed's arrest interrupted his continuing conduct against Doe, even though the arrest occurred near the scene of the crime. He then became aggressive with officers and apparently damaged the patrol car by kicking its interior. The prosecution relied on these separate incidents in their closing argument, and therefore the court had a sua sponte duty to instruct the jury as to unanimity.

Nonetheless, for the reasons we have previously discussed, we conclude the error was harmless. No evidence was entered regarding the damage to the patrol car. The only dollar amount regarding damage came from the apartment manager who testified the cost to repair Doe's windows was $150 each, for a total of $450. With no evidence before it regarding the cost of damage to the police car, the jury could not have included information about that in its verdict. Further, although Reed argues this evidence from the property manager about the windows was "speculative," the property manager's testimony was sufficient to prove the amount of damage, and Reed does not argue she was unqualified to proffer an opinion regarding the costs of repair. Accordingly, the failure to give the unanimity instruction was harmless error, and the judgment for the vandalism conviction is affirmed.

## VI.

### *The Sentence on Counts 3 and 5*

In his final contention, Reed argues the trial court was required to stay punishment on the burglary conviction (count 5) pursuant to section 654.

According to Reed, the mayhem offense and burglary offense were part of a continuous course of criminal conduct committed with a single objective intent. We disagree and affirm the conviction.

A. *Additional Background*

The trial court provided a modified version of the standard jury instruction for burglary, CALCRIM No. 1700. The court instructed the jury that the prosecution was required to prove (1) Reed entered a building; and (2) when he entered a building, he intended to commit attempted homicide or felony domestic violence or mayhem." The instruction also explained that the prosecution alleged Reed "intended to commit attempted homicide or felony domestic violence or mayhem. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of entry. You do not all have to agree on which one of those crimes he intended."

After Reed was convicted, he filed a sentencing memorandum in which he argued he could not be sentenced for the burglary offense (count 5) and the assaultive offenses (counts 3 and 4), because they were committed with "one intention, one general impulse and one plan." The prosecution disagreed and contended the offenses should be punished separately. The prosecution argued section 654 was inapplicable and urged the court to impose consecutive prison terms.

The court agreed with the prosecution and imposed consecutive terms of imprisonment for counts 3 and 5. In rendering its decision, the court commented:

> The Court has read and considered the factors affecting the imposition of concurrent or consecutive sentences as set out in [California Rules of Court,] [r]ule 4.425, [s]ubdivision [(a)], based on the record of conviction and the testimony of witnesses and the totality of the evidence and the reasonable inferenced to be

35

drawn therefrom, together with the jury's findings of guilt and findings on the charged allegations, the totality of the evidence supports a finding that [Reed] had sufficient time to reflect on his conduct before continuing his assaults and, further, that the respective objectives of the crimes of which [Reed] was found guilty in Counts 3, 5, and 6 were predominantly independent of each other in time and place including being committed against different victims as to Counts 6 and 7.

B.    *Analysis*

Section 654, subdivision (a), provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  This statute prohibits multiple punishment for different crimes complete by a single physical act, or "where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction."  (*People v. Perez* (1979) 23 Cal.3d 545, 551.)  The purpose of section 654 is to ensure "a defendant's punishment will be commensurate with his culpability."  (*Ibid.*)

Generally, a defendant may not be sentenced for a burglary offense and the intended felony underlying the burglary.  (*People v. Radil* (1977) 76 Cal.App.3d 702, 713.)  If the defendant's conduct constitutes more than a single physical act, we consider whether the conduct constitutes an indivisible transaction, or, in other words, "whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives."  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  However, even where the defendant has a single intent and objective in committing more than one offense, multiple punishment may be proper where the conduct is "divisible in time."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 (*Beamon*).)

36

When the offenses are divisible in time, the defendant is afforded the "opportunity to reflect" between the offenses and they may be punished separately. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253–1256.)

"Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance." (*Beamon, supra*, 8 Cal.3d at p. 636.) "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

Here, the Attorney General argues multiple punishment on the mayhem and burglary counts is permissible due to temporal and spatial distance between the offenses. The Attorney General argues this separation in time permitted Reed an opportunity to reflect on and renew his intent at each step in the events that evening, such that he entertained multiple criminal objectives. Reed responds that there is no separation in the activities that night, nor was there time to reflect. He argues that the record demonstrated Reed kicked in Doe's door, immediately followed her outside, and committed the "mayhem incident" as they continued to argue on the stairs.

Giving the trial court broad latitude in its determination of the application of section 654, as *Hutchins* instructs us, we conclude substantial evidence supports the court's finding that multiple punishments for the mayhem and burglary offenses was permissible. The record demonstrates that Reed entered Doe's home with the intent to commit violence against her.

Doe left the home and walked outside to a stairwell. Reed left the residence and went after Doe. Outside, Doe attempted to contact police, and Reed grabbed her phone and threw it. It was only after these series of events occurred that Reed attempted to stab Doe, which prompted her to grab the knife and sustain her injuries.

The temporal and spatial distance between Reed's initial entry into the home, and his attack on Doe outside of the apartment near the stairwell, was sufficient to permit Reed the opportunity to reflect on and renew his assaultive intent. (*People v. Vidaurri* (1980) 103 Cal.App.3d 450, 465 [conduct not part of the defendant's initial plan or committed in response to unforeseen events is separately punishable].) On the facts before us we are satisfied the offenses were divisible in time such that Reed was able to reflect on the next steps. Reed's sentence does not violate section 654.

## VII.

### *The Abstract of Judgment Must Be Corrected*

On appeal, the Attorney General discloses two errors to the abstract of judgment. First, the abstract incorrectly reflects that the court stayed punishment for count 6 under section 654. Next, the abstract indicates the court imposed punishment for the great bodily injury allegation attached to count 4. We agree these provisions of the abstract are in error; in its oral pronouncement of judgment the court imposed a consecutive term of imprisonment of one year four months for count 6, and "dismissed" the enhancements. Accordingly, the abstract of judgment must be corrected to accurately reflect the oral pronouncement of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186–187 [appellate courts may correct errors to the abstract of judgment].)

## DISPOSITION

The abstract of judgment shall be amended to reflect a consecutive one-year four-month consecutive sentence on count 4, and to delete the imposition of sentence for the allegation under section 12022.7, subdivision (e).  In all other respects, the judgment is affirmed.


                                                          RUBIN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.